## CŒUR D'ALENE CONSOLIDATED & MINING CO. *v.* MINERS' UNION OF WARDNER *et al.*

*(Circuit Court, D. Idaho. July 11, 1892.)*

1. INJUNCTION—LABOR UNIONS—INTERFERENCE WITH EMPLOYES.
    An injunction may be granted to restrain labor unions and members thereof from entering upon complainant's mines, or interfering with the working thereof, or by force, threats, or intimidation, preventing complainant's employes from working the mines, where the threatened acts are such that their frequent occurrence may be expected, and defendants are insolvent.

2. SAME—RESTRAINING TRESPASS TO REALTY.
    The rule that a trespass cannot be enjoined unless on realty, and where the damage is irreparable, and after the right or title involved has been established at law, does not apply to such a case, as no title to realty is involved, and the acts complained of are not a direct trespass to realty, but only indirectly affect the enjoyment of property and other rights.

3. SAME—RESTRAINING CRIMINAL ACTS.
    Neither does the rule that equity will not interfere for the prevention of crime apply, the acts done or threatened not being criminal, though unlawful, and such as may lead to the commission of criminal acts.

4. SAME—EVIDENCE—GOVERNOR'S PROCLAMATION.
    On the question of continuing such an injunction pending the suit, statements supporting complainant's allegations, contained in a proclamation by the governor of the state, which is part of the record in the case, made by him after personal investigation of the facts, may be considered.

5. SAME—GOOD FAITH OF COMPLAINANT.
    An allegation by complainant that defendants' interference had compelled a former suspension of work, for which, at the time, complainant gave a different reason, does not show such bad faith as to justify a dissolution of the injunction, where, so far as appears, both causes may have induced the suspension.

6. SAME—COMPLAINANT MEMBER OF ILLEGAL ASSOCIATION.
    The fact that complainant is a member of an association which is alleged to be illegal, is no ground for refusing to entertain its suit, instituted in its own name, and for its own interest, and not appearing to be the direct result or a part of any illegal association, scheme, or conspiracy.

In Equity. Action by the Cœur d'Alene Consolidated & Mining Company against the Miners' Union of Wardner and others. Order continuing injunction against defendants pending the action.

*Albert Hagan* and *W. B. Heyburn,* for complainant.

*Frank Ganahl* and *James H. Hawley,* for defendants.

BEATTY, District Judge. The local interest manifested in this cause, and its possible consequences, justify a somewhat extended statement of the facts and reasons for the conclusion reached, and, while all the questions raised by counsel, who have so ably and fully presented the matter, have been considered, apology will not be offered for a failure to here elaborately review them. The bill and affidavits accompanying it show that complainant is a foreign corporation; that defendant companies are corporations and associations organized under the laws of Idaho, and the other defendants citizens of said state; that through defendants' wrongful acts, complainant has been damaged in the sum of $50,-000; that complainant owns valuable mining property in Shoshone county, Idaho, which it desires to work; that defendants having conspired together, have organized themselves into the several miners' unions named, for the purpose not only of controlling and dictating the wages to be paid them, but also by means of menace and force to prevent all persons not members of such unions from working for complainant; that, to make efficient such organizations, they are bound by stringent oaths to secrecy, and to obedience to all edicts and commands of either of such unions; that since the formation of such unions the members thereof have adopted a systematic course of threats and intimidations against complainant, and any miners desiring to work for it who are not members of such unions; that they have notified complainant that it must employ none but those who belong to such orders, and at the wages fixed by the latter; that they have entered upon complainant's mines, and by force removed therefrom its employes, and given out and threatened that they would continue to prevent any but the members of such unions from working therein; that by reason of the premises complainant has been compelled to cease work; that all the defendants are utterly insolvent, and unable to respond in damages; that by the affidavits of two of complainant's employes, it appears that on the 29th day of last April about a hundred men, headed by defendant John Tobin, went to complainant's mine, where affiants were at work, and forcibly ejected them therefrom, took them to the Miners' Union Hall, at Burke, where, in the presence of a large number of men, it was demanded they should join the union or leave the camp; that upon their refusal to do either it was ordered by the meeting that they be marched out of the state; that thereupon they were escorted in the direction of Thompson Falls, Mont., by at least 200 men, who beat oil cans in imitation of drums; that they were called "scabs," and coarse indignities were frequently heaped upon them; that in this manner they were driven from the state, denied the privilege of purchasing food, and for two days were without any, and exposed to the inclemency of the weather in crossing a snowy range into the state of Montana. Upon these and similar allegations contained in said complaint and affidavits, it was ordered that the defendants be restrained from entering upon complainant's mines, or from interfering with the working thereof, or by the use of force, threats, or intimidations, or by other means, from interfering with or preventing complainant's employes from working upon its mines; and that the de-

fendants show cause why they should not be so restrained pending this action.

In response to such order defendants have by numerous affidavits denied most of such allegations, and especially those charging a resort to, threats or force to accomplish the object of their several associations, which they state are for the purpose of protecting themselves against the exactions of employers, of maintaining their wages, of elevating the standard of labor by admission to their order only of those who are skilled workmen and of good morals, to alleviate the sufferings of those overtaken by sickness or accident, and in various ways, and by all lawful means, to advance the interests of miners, and to this end, intemperance, immorality, and the vices of life are discouraged. In rebutting such affidavits the complainant has produced others, which charge the existence of a most alarming and demoralizing state of society, wherein a reign of riot, terror, and lawlessness has supplanted industry, peace, and law; but such specific acts and matter stated in the rebutting affidavits, which defendants could not, from complainant's original showing, so anticipate as to deny, are not treated as established. However, the evidence justifies the conclusion that defendants are organized into associations wherein submission to stringent and arbitrary rules is required; that by means approaching dictation they have attempted to control employers in the selection of laborers and the wages to be paid them, and have discouraged, and, as far as they could, prevented, those who do not belong to their societies from procuring work; that by force, in one instance, they took complainant's laborers from its mine to their hall, where, upon such laborers refusing to comply with their demands to join them, and abide by their laws, they actually ordered their banishment from the state, and in a manner deserving the most severe condemnation enforced their lawless decree, and against men who, by reason of their birth, and not through the grace of the government, were entitled to all the rights of American citizenship; that in such numbers, and under such circumstances, as were menacing, they have requested nonunion men to cease work, and to such have applied in an offensive and threatening manner most opprobrious epithets, and in other ways have annoyed and vexed laborers who refuse to join their associations. I am not unmindful that they meet these charges by alleging in effect that when such things were done it was without their authority, and that the meeting referred to was held by citizens; but such defense is too transparent to conceal the truth. Such meeting was held in their hall, was composed largely of miners, and was presided over by defendant John Tobin, who says "he was, and now is, the president of the Miners' Union of Burke;" and he also says that "the meeting voted that they [the men banished] should be marched up the canyon, upon the ground that if they proceeded down the canyon violence might be apprehended from the outsiders." Such explanations cannot be received in exculpation of the wrong done by defendants, but, on the contrary, they cast a shadow over all their statements. Moreover, the governor of this state, after a personal investigation of the facts, aided by one of his official staff, did by his proclamation of June 4,

1892, declare that it had come to his knowledge "that there now exists in the county of Shoshone, state of Idaho, combinations of men confederating and conspiring for unlawful purposes, insomuch that the property of citizens of said county is jeopardized, and the people thereof terrorized, and the laws are set at naught; and * * * the civil authorities seem inadequate or are disinclined to suppress violence and redress wrongs; and * * * such combinations are preventing by force the owners of mines from working and developing the same, and from employing persons of their choice, and are interfering with railroad travel and traffic." As such proclamation is a public document, and is also made a part of the record in this case, the court is justified in considering it, and from the known integrity, the dispassionate judgment, and the impartial character of his excellency, its statements are entitled to the highest respect.

After a most careful examination, the conclusion that the foregoing is a correct statement of the facts cannot be avoided. A wrong exists; rights have been infringed; unoffending citizens have been maltreated; the law has been overridden. May the courts be successfully invoked for restraining relief? That a national court has original jurisdiction in actions of this class cannot be questioned, as the parties are of diverse citizenship, and damages of over $2,000 are involved; but the important question is whether a court of chancery can exercise its power to restrain the further commission of the acts herein complained of. The unrestrained execution of the designs, which it would seem from the record in this case the defendants entertain, would result unfortunately. Carried to their logical conclusion, the owner of property would lose its control and management. It would be worked by such laborers, during such hours, at such wages, and under such regulations, as the laborers themselves might direct. Under such rule, its possession would become onerous. Enterprises employing labor would cease, and, instead of activity and plenty, idleness and want would follow. Whatever enthusiasts may hope for, in this country every owner of property may work it as he will, by whom he pleases, at such wages, and upon such terms as he can make; and every laborer may work or not, as he sees fit, for whom, and at such wages as, he pleases; and neither can dictate to the other how he shall use his own, whether of property, time, or skill. Any other system cannot be tolerated. The association of laboring men into organizations for social enjoyment, mental improvement, for the protection of their interests, and the amelioration of their conditions, is not condemned, either by the people or the law. On the contrary, it is their right so to do, and they have the sympathy of all classes in their efforts to advance their interests by lawful means. No one will view with envy their lawfully acquired success, their comfortable homes and congenial surroundings, all attainable through industry, sobriety, and reasonable economy. Unfortunately, combinations of labor are met by associations of employers, each trying to baffle what it deems the aggressions of the other. It is to be regretted these opposing forces have in late years gone so far in their efforts for supremacy that they now

operate upon the principle that their interests are antagonistic. It is when these contests become so heated that violations of the law, the peace of the community, and the destruction of life and property are threatened, that the courts are compelled to intervene. Undesirable as is the duty, the court which avoids it when presented would deserve only contempt. As I understand the law and the facts, this case shall be determined without equivocation. The action results from a controversy concerning wages. The complainant refuses to accede to defendants' demands that the same wages be paid to all the laborers; but, while willing to pay the usual price of $3.50 per day to skilled laborers, declines to pay over $3 to others. Which party may be right on this or any other matter that may be in dispute is not for investigation by the court, but whether the defendants, in attempting to maintain their position, are likely to employ unlawful means, and the authority of the court, if it so finds, to restrain them, alone must be determined.

Among other reasons advanced why the restraining order should now be dissolved, the defendants say that complainant has in bad faith alleged that it was compelled in January last to close its mines because the defendants interfered with the working thereof, whereas at that time it stated that it was for the purpose of securing an adjustment of the railroad freight rates, and defendants now allege that the real object was to reduce wages, and to break up the miners' unions. Certainly it is true that he who asks equity must not by his pleadings or acts attempt to mislead either the court or his opponent. So far as yet appears, the two causes combined may have induced complainant to close its mines, as stated, and the duplicity charged against it is not so shown as to justify a dissolution of the existing order. Neither is the other objection, that complainant is a member of an association which it is alleged is illegal, a reason why the court will not entertain its suit, when instituted in its own name, and in its own interest, as the record shows has been done in this case. The wrong complainant may have committed in some other matter is not the subject of consideration here, or at least not until it is made to appear that this action is the direct result and a part of some illegal association, scheme, or conspiracy. Is it true, as claimed by defendants' counsel, that the acts charged in the bill are either a trespass or a nuisance; that a trespass cannot be enjoined unless upon realty, and when the damage is irreparable; and that the right at law must be established before equity will intervene? Before a permanent injunction will issue, undoubtedly a right or title involved must be established in a court of law, but if, by the weight of authority, such was ever the law as applied to temporary writs, it is not so now. But, as there is no title to realty involved, and the acts complained of are not a direct trespass upon realty, but only such as indirectly affect the enjoyment of property and other rights, the pertinency of counsel's argument cannot be admitted.

With much earnestness it has been urged that equity will not interfere for the prevention of crime. But wherein is this a criminal case,

or how does the relief asked constitute this an action for injunction against the commission of a crime?  It is charged that a conspiracy has been formed.  An association becomes a criminal conspiracy when it is formed for an unlawful or criminal purpose, or if, when organized for a lawful purpose, it attempts, by criminal or unlawful means, to attain its object, but this action is not to prevent the formation of a conspiracy. It is alleged that defendants have done certain unlawful acts, and threaten to continue doing them; but none of such acts are *per se* criminal, or enjoined by the criminal statutes.  The most that can be said of them is that they are such as interfere with the rights of others, and are therefore unlawful.  It is also true that they might lead to the commission of other acts purely criminal, and that by restraining them we indirectly prevent the commission of crimes; but it is absurd to conclude that by such indirect prevention of crime this can be construed as an action to restrain its commission.

Without further pursuing this view, we are brought to the important question involved,—whether the acts complained of, considered as unlawful and not criminal, may be restrained, and further injury to complainant avoided, or whether it must seek relief by an action at law. The threatened acts are such that their frequent occurrence might be expected, and to obtain legal redress therefor the annoyance of a multiplicity of suits would follow; also it is alleged that defendants are insolvent,—both of which are among the prime reasons that appeal to a court of equity for its preventive relief.  The question involved is not a new one.  Its examination may be better made by a review of some of the numerous adjudications by other courts.  In *Francis* v. *Flinn*, 118 U. S. 385, 6 Sup. Ct. Rep. 1148, the complaint was that defendants, by newspaper publications, by sundry suits, and by various and diverse ways, had confederated to destroy complainant's business.  The court, while stating that it did not specifically appear what the objectionable acts were, held that for injuries suffered from acts of the general character named,—which were in the nature of libels on the business,—an adequate remedy existed at law.  In *Kidd* v. *Horry*, 28 Fed. Rep. 774, the sole question was whether the publication of circular letters, which were alleged to be libelous against complainant's business, could be restrained, and it was held they could not.  To the same effect is *Car Wheel Co.* v. *Bemis*, 29 Fed. Rep. 95, and numerous similar cases.  It is clearly established that libelous publications or statements, however damaging, will not be restrained, but for such relief something more must be involved.  What more, will appear from a line of authorities relied upon by complainant.  *Steamship Co.* v. *McKenna*, 30 Fed. Rep. 48, was an action in which defendants, over a question of wages, had induced complainant's employes to cease work, and then attempted, by sending threatening letters to its customers and others, to so damage and interfere with complainant's business as to compel it to yield to their demands.  The court, in granting relief, said:

"All combinations and associations designed to coerce workmen to become members, or to interfere with, obstruct, vex, or annoy them in working or

in obtaining work because they are not members, or in order to induce them to become members, or designed to prevent employers from making a just discrimination in the rate of wages paid to the skillful and to the unskillful, to the diligent and to the lazy, to the efficient and to the inefficient; and all associations designed to interfere with the perfect freedom of employers in the proper management and control of their lawful business, or to dictate in any particular the terms upon which their business shall be conducted, by means of threats of injury or loss, by interfence with their property or traffic, or with their lawful employment of other persons as designed to abridge any of those rights,—are *pro tanto* illegal combinations or associations, and all acts done in furtherance of such intentions by such means, and accompanied by damages, are actionable."

In *Emack* v. *Kane*, 34 Fed. Rep. 46, the parties were manufacturers of patent slates, and the court restrained one from sending circulars to the customers of the other, threatening them with litigation, and tending to intimidate them from dealing in and buying the rival slates. *Casey* v. *Typographical Union*, 45 Fed. Rep. 135, is a case in which the defendants demanded that plaintiff should employ only union printers, and at the wages fixed by the union; that, upon his refusal to comply, they boycotted his paper by the publication of handbills calling upon all to withdraw their patronage, and threatened those who failed to do so with their ill will, and visited plaintiff's customers, and threatened them with the ill will of all organized labor. After a full review of the authorities, and noting the distinction between injury to one's business by merely libeling it, and that resulting from threats and intimidations against those who are the customers of or employes therein, the court held that all boycotts of a business, or attempts to injure it through such threats and intimidations, were unlawful, and could be enjoined. Justice BREWER while on the circuit bench punished railroad employes who were engaged in a strike for interfering with other employes in operating a road which was in the hands of a receiver. No force was resorted to, but only persuasions or requests to cease work were used, but they were made under such circumstances and by such numbers as to convey the impression that they were to be obeyed, and tended to intimidate those who desired to work. All such acts were held unlawful, and were punished by fine and imprisonment. *U. S.* v. *Kane*, 23 Fed. Rep. 748. *Sherry* v. *Perkins*, 147 Mass. 212, 17 N. E. Rep. 307, is a strong and late case, in which a contest arose between some workmen and their employers, and to deter other workmen from entering into his service they marched in front of his store with a banner bearing an inscription requesting other workmen to keep away. The court says:

"The wrong is not, as argued by the defendant's counsel, a libel upon the plaintiff's business. It is not found that the inscriptions upon the banner were false, nor do they appear to have been in disparagement of the plaintiff's business. The scheme in pursuance of which the banners were displayed or maintained was to injure plaintiff's business, not by defaming it to the public, but by intimidating workmen so as to deter them from keeping or making engagements with the plaintiff. The banner was a standing menace to all who were or wished to be in the employment of the plaintiff to deter them from entering plaintiff's premises. Maintaining it was a contin-

nous unlawful act, injurious to plaintiff's business and property, and was a nuisance such as a court of equity will grant relief against."

—And injunction was granted. While there are numerous other authorities upon this question, further time in their review will not be consumed, as I believe the foregoing state the law.

A clear distinction will be observed between the two classes of cases above noted. In the one, when the acts complained of consist of such misrepresentations of a business that they tend to its injury, and damage to its proprietor, the offense is simply a libel; and in this country the courts have with great unanimity held that they will not interfere by injunction, but that the injured party must rely upon his remedy at law. On the contrary, when the attempt to injure consists of acts or words which will operate to intimidate and prevent the customers of a party from dealing with or laborers from working for him, the courts have with nearly equal unanimity interposed by injunction. In the one case it is an injury to a man's business by libeling it; in the other, by force, threats, and other like means, he is prevented from pursuing it; and, while the damage might be as great in one case as in the other, —but most likely with different consequences to the good order and peace of the community,—the courts have determined upon different remedies. What constitute such actionable threats or intimidations must be determined in each case from all the circumstances attending it. If the things done or the words spoken are such that they will excite fear or a reasonable apprehension of damages, and so influence those for whom designed as to prevent them from freely doing what they desire, and the law permits, they may be restrained, and the courts will look beyond the mere letter of the act or word into its spirit and intent. In this case, however, it is unnecessary to enter into any close analysis of the acts complained of to determine that they amount to menace and threats, for they clearly were in a high degree of that character. That they may not be repeated the restraining order is continued, pending the final disposition of this action.

Attention has been called to the fact that service of the order was made upon the proprietors of two newspapers, which has led to the wild report that the public press has been muzzled, and appeals have gone out that the irresistible power of the government has been exercised in silencing the people's monitors, in all of which there is much pathos untempered by truth. What reason existed for such service upon those two defendants has not been specially developed by the evidence, but the order was not intended to, nor does it in any degree, restrain the publication of newspapers. The wisdom of the American policy which upholds the freedom of the press is fully indorsed by the court. If, however, those defendants were engaged in doing the acts complained of, or threatened to commit them, they were rightly enjoined, for they are amenable to the law just as other citizens. The court, however, is slow to believe that men who occupy the high and responsible position of proprietors of newspapers, which constitute such a powerful medium for influencing, shaping, and controlling the sentiments, the morals,

and the conduct of the people, would use their columns to incite the lawless or thoughtless to acts of violence or crime. The courts with good reason expect the public press to be conservators of the peace, and, whether or not they agree with the law, either as enacted or construed, that they will in good faith advise its observance until amended or reversed.