WEBB v. COOKS', WAITERS' & WAITRESSES' UNION, No. 748, et al.
(No. 8986.)

(Court of Civil Appeals of Texas. Ft. Worth. April 20, 1918. Rehearing Denied June 22, 1918.)

1. INJUNCTION ☞101(3)—PICKETING — "INTIMIDATION"—"COERCION"—TRADE UNIONS—BOYCOTT.

The acts of a labor union which seeks to force an employer to unionize his restaurant by means of picketing and boycott amount to "intimidation" and "coercion," and are unlawful and subject to injunctive relief, even though no open threat or violence are proven.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Coercion; Intimidation.]

2. INJUNCTION ☞101(1) — COMBINATION—BOYCOTT—TRADE UNIONS.

The constitutional right of an individual to trade where he pleases does not confer upon a labor union of which he is a member the right to picket and boycott as an organization.

3. INJUNCTION ☞101(1)—INJURIES TO BUSINESS—BOYCOTT.

A boycott by a labor union invades the constitutional rights of the employer to conduct his business on terms of equality with others, and is illegal, even though the ultimate object is the welfare of the union members rather than injury to the employer.

4. INJUNCTION ☞101(1)—TRADE UNIONS —BOYCOTT.

Where the acts done by a trade union in a boycott have the inevitable effect of causing injury to plaintiff, seeking injunctive relief, intent to injure is implied.

5. INJUNCTION ☞101(1)— BOYCOTT — INJURIES TO BUSINESS—"MALICE."

An injury knowingly and voluntarily inflicted upon plaintiff's business by picketing and boycott is malicious warranting injunctive relief; malice, in a legal sense, denoting wrongful acts intentionally done without just cause or excuse.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Malice.]

6. INJUNCTION ☞101(3) — PICKETING AND BOYCOTT.

Where a labor union by concerted action seeks to coerce an employer to unionize his business, and by picketing and boycotting amounting to intimidation injures his business, such interference will be enjoined.

---

7. MONOPOLIES ⊖⇒12(2) — UNLAWFUL COM-
BINATION—TRADE UNIONS—"TRUST."

Where a labor union combines to boycott
and picket an employer to coerce him into
unionizing his business, such combination is a
trust within Vernon's Sayles' Ann. Civ. St.
1914, art. 7796, and is illegal under article
7799.

[Ed. Note.—For other definitions, see Words
and Phrases, Second Series, Trust.]

8. MONOPOLIES ⊖⇒10—PICKETING AND BOY-
COTT.

Vernon's Sayles' Ann. Civ. St. 1914, art.
5245, providing that it shall not be unlawful
for a member of a union to induce by lawful
means any person to accept or relinquish em-
ployment, is not, in view of article 5246, at
variance with the anti-trust laws, and does not
permit the picketing and boycott of an em-
ployer, whose employés are in harmony with
him, with the view of compelling the unionizing
of the business.

Appeal from District Court, Tarrant Coun-
ty; R. E. L. Roy, Judge.

Suit by G. R. Webb against the Cooks',
Waiters' & Waitresses' Union, No. 748, and
others. From a judgment for defendants,
plaintiff appeals. Reversed and rendered.

Chas. T. Rowland and Marvin H. Brown,
both of Ft. Worth, for appellant. Dee Estes,
Capps, Cantey, Hanger & Short, and David
B. Trammell, all of Ft. Worth, for appellees.

CONNER, C. J. This appeal is from a
judgment denying injunctive relief sought by
appellant against the Cooks', Waiters' & Wait-
resses' Union, Local No. 748, of the city of
Ft. Worth, and the officers and members of
said union. In substance it was alleged that
said officers and members of said union had
conspired together to intimidate, coerce, and
harass the plaintiff and injure his business,
which was that of a restaurant or café own-
er, and to that end had caused his place of
business to be "picketed," etc., to his great
and irreparable injury, etc.

The case is the first of its kind, so far as
we are advised, that has reached an appel-
late tribunal of Texas, but so much has been
written by courts in other jurisdictions on
the subject herein involved that it almost
seems superfluous to do more than to declare
our conclusion with a citation of numerous
cases where the subject of a labor union's
attempt to boycott and picket has been treat-
ed. But because of the importance of the
subject, and of the earnestness with which
this cause has been presented, and because
we think we have statutes relating to the
questions involved, it will perhaps be our
duty to set forth our conclusions, at least
briefly.

To be as brief as possible, then, we will
further state that a hearing was had by the
court upon the evidence and the injunction
denied under the facts. We therefore deem
it immaterial to discuss at length the court's
rulings upon the demurrers to the plaintiff's
petition. We content ourselves on this branch
of the appeal with the simple statement that

in our judgment the facts as alleged by the
plaintiff below and the appellant here were
sufficient to entitle the plaintiff to an injunc-
tion as prayed for.

But are the facts sufficient? After a care-
ful consideration of the evidence and of the
authorities we think they are. Briefly stat-
ed, the undisputed evidence is to the effect
that after a visit by Mr. Childs, business
agent, sometimes designated as the "walking
delegate," of the union, and Mr. Webb's re-
fusal to "unionize" his place of business by
signing a contract to employ none but mem-
bers of the union or those affiliated there-
with, at the scale of prices for prescribed
hours per week, etc., the union in open meet-
ing, upon Mr. Childs' report, agreed to and
ordered the "picketing" of Mr. Webb's place.
Pickets from among the members were ap-
pointed by Mr. Childs and regularly paid by
the authorized officers of the union. The
picketing had continued about two weeks
prior to the trial, and consisted of the pick-
ets, two or more at a time, walking back and
forward in front of plaintiff's restaurant and
handing out to passers-by cards upon which
were printed the words:

"This café is unfair to organized labor.
Cooks', Waiters' & Waitresses' Union, Local
No. 748."

Appellant testified that he had seen as
many as six people standing in front of his
place of business handing these cards out,
usually, however, but two, the number desig-
nated by the union, and heard such remarks
by the pickets as:

"Please don't go into that café!" "We are
working for organized labor!" "We will win!"

The officers of the union, however, testified
that the instructions to the pickets were to
merely hand out the cards without remarks,
and the pickets who testified denied making
remarks. Appellant also testified without
contradiction that the wages paid by him
exceeded those prescribed by the union, and
the evidence discloses no complaint as to the
qualification or character of appellant's em-
ployés or of the hours of service required of
them. Appellant further testified without
contradiction that as a result of the picketing
his daily receipts fell off from $10 to $15 per
day, that he was 46 years old, a native of
Georgia, and that it was not a pleasant thing
personally to be "picketed against." In de-
scribing its effect upon him, appellant used
the following words:

"If I said what I think of it personally, when-
ever I see a man out in front of my place of
business trying to keep me from making a living
for my wife and family, I feel just like I ought
to take a gun and kill him."

There was also testimony showing the in-
solvency of the defendants, and other testi-
mony that will be noticed further on in the
course of our opinion, but for the present we
think the foregoing outline of the facts will
present a sufficient view of the case.

We as a people are exceedingly sensitive to influences of the kind indicated. We have adopted as a slogan the saying, "Vox populi, vox Dei." The voice of the people determine the tenure and rewards of the officeholder and who shall hold the offices. The influence of such voice enters into all of our laws, and it is therefore particularly true of us that the officeholder, the candidate for office, those engaged in business, and those of the general public to whom participation in a heated controversy of any kind is distasteful and repugnant, are all influenced in varying degrees by efforts, vocal or otherwise, of a labor organization with which other labor organizations are affiliated. The evidence shows without dispute that in the city of Ft. Worth there are numerous labor organizations with a large membership which have headquarters in which is designated in the evidence as "Labor Temple," where the defendant union has its headquarters.

[1] It therefore seems idle to say under circumstances as indicated that the acts complained of and shown are not provocative of violence and bloodshed, and do not amount to intimidation and coercion. We at least cannot hide nor obscure the truth with the specious contention urged herein that no open threats or violence was proven. We must know what has frequently been declared in adjudicated cases, that restraint of the mind is just as potent as a threat of physical violence. See Barr v. Essex Trades Council, 53 N. J. Eq. 111, 30 Atl. 881; Purvis v. Local No. 500, U. B. C. & J., 214 Pa. 348, 63 Atl. 585, 12 L. R. A. (N. S.) 642, 112 Am. St. Rep. 757.

In Beck v. Railway Teamsters' Protective Union, 118 Mich. 497, 77 N. W. 13, 42 L. R. A. 407, 74 Am. St. Rep. 421, it was held:

"That the boycotting of one who refuses to accede to the demands of the union is unlawful, where the means used to prevent persons from dealing with the person boycotted are threatening in their nature, and tend naturally to overcome, by fear of loss of property, the will of others, and compel them to do what they would not otherwise do," although such means are "unaccompanied by actual violence or threats of violence."

The courts of the country generally with but few exceptions have expressed like views. See Cœur D'Alene Consol. Min. Co. v. Miners' Union (C. C.) 19 L. R. A. 382, 51 Fed. 260; Toledo, A. A. & N. M. R. Co. v. Pennsylvania Co. (C. C.) 54 Fed. 730, 19 L. R. A. 387; United States v. Weber (C. C.) 114 Fed. 950; Seattle Brewing & Malting Co. v. Hensen (C. C.) 144 Fed. 1011; My Maryland Lodge, No. 186, v. Adt, 100 Md. 238, 59 Atl. 721, 68 L. R. A. 752; Vegelahn v. Guntner, 167 Mass. 92, 44 N. E. 1077, 35 L. R. A. 722, 57 Am. St. Rep. 443; Plant v. Woods, 176 Mass. 492, 57 N. E. 1011, 51 L. R. A. 339, 79 Am. St. Rep. 30; Berry v. Donovan, 188 Mass. 353, 74 N. E. 603, 5 L. R. A. (N. S.) 899, 108 Am. St. Rep. 499, 3 Ann. Cas. 738; Erdman v. Mitchell, 207 Pa. 79, 56 Atl. 327, 63 L. R. A. 534, 99 Am. St. Rep. 783; Purvis v. Local No. 500, U. B. C. & J., 214 Pa. 348, 63 Atl. 585, 12 L. R. A. (N. S.) 642, 112 Am. St. Rep. 757; State v. Stewart, 59 Vt. 273, 9 Atl. 559, 59 Am. Rep. 710; Boutwell v. Marr, 71 Vt. 1, 42 Atl. 607, 43 L. R. A. 803, 76 Am. St. Rep. 746; Lohse Patent Door Co. v. Fuelle, 215 Mo. 421, 114 S. W. 997, 22 L. R. A. (N. S.) 607, 128 Am. St. Rep. 492.

[2] Appellees insist, in effect, that inasmuch as a single individual may under constitutional guaranty freely speak or write as he pleases without injunctive restraint, an association or combination of persons may lawfully do likewise, and hence that the defendants committed no wrong. It is, of course, apparent from the proof in this case that the pickets were not merely expressing their individual views and wishes. On the contrary, they were giving voice to the concerted will and desire of a powerful organization. The difference in the two things is quite distinct, both in character and force. The following quotation from the opinion in American Fed. of Labor v. Buck's Stove & Range Co., reported in 33 App. D. C. 83, 32 L. R. A. (N. S.) 749, will illustrate the difference mentioned and indicates our view, viz.:

"The contention is put forward that, inasmuch as each member of the federation has the right to bestow his trade where he will, according to his whim or fancy, it cannot be unlawful for a combination of members to do what each, acting separately, may do, and that therefore the combination may lawfully discontinue or threaten to discontinue business intercourse with a given firm and all who handle its product; or, to state the proposition bluntly, that the boycott, as previously defined, is lawful. To admit the soundness of this contention is to give legal support and standing to an engine of harm and oppression utterly at variance with the spirit and theory of our institutions, place the weak at the mercy of the strong, foster monoply, permit an unwarranted interference with the natural course of trade, and deprive the citizen of the freedom guaranteed him by the Constitution. The loss of the trade of a single individual ordinarily affects a given dealer very little. Being discriminating, the purchasing public, if left free to exercise its own judgment, will not act arbitrarily or maliciously, but will be controlled by natural considerations. But a powerful combination to boycott immediately deflects the natural course of trade, and ruin follows in its wake because of the unlawful design of the conspirators to coerce or destroy the object of their displeasure. In other words, it is the conspiracy, and not natural causes, that is responsible for the result. From time immemorial the law has frowned upon combinations formed for the purpose of doing harm, and we think public policy demands that such a combination as we have found to exist in this case be declared unlawful. As was said by Mr. Chief Justice Fuller of a similar combination: 'The combination charged falls within the class of restraints of trade aimed at compelling third parties and strangers involuntarily not to engage in the course of trade except on conditions that the combination imposes; and there is no doubt that (to quote from the well-known work of Chief Justice Erle on Trade Unions) "at common law every person has individually, and the public also has collectively, a right to require that the course of trade

should be kept free from unreasonable obstruction."''

[3] It is further insisted in behalf of appellees, and its witnesses so testified, that the object was not to injure appellant, but to promote the legitimate purposes of the union to better the conditions of the laboring man. Such purposes are, of course, worthy of all commendation, and by all lawful means are to be encouraged. But in the accomplishment of such purpose care must be exercised not to invade the field of the rights of other persons; for it is fundamental with us that all men have equal rights, that no man, or set of men, is entitled to separate public emoluments or privileges, save for public services, and that all of our citizens are entitled to the equal protection of our laws. The right of appellant to conduct his business upon terms of equality with all other persons is an essential part of his constitutional rights as an American citizen. In Allgeyer v. Louisana, 165 U. S. 578, 17 Sup. Ct. 427, 41 L. Ed. 835, the Supreme Court of the United States quoted and approved the following from another decision, viz.:

"The right to follow any of the common occupations of life is an inalienable right. It was formulated as such under the phrase 'pursuit of happiness' in the Declaration of Independence. * * * This right is a large ingredient in the civil liberty of the citizen."

In Hopkins v. Oxley Stave Co., 28 C. C. A. 99, 49 U. S. App. 709, 83 Fed. 912, the Circuit Court of Appeals for the Eighth Circuit said:

"The right of an individual to carry on his business as he sees fit, and to use such implements or processes of manufacture as he desires to use, provided he follows a lawful avocation, and conducts it in a lawful manner, is entitled to as much consideration as his other personal rights; and the law should afford protection against the efforts of powerful combinations to rob him of that right and coerce his will by intimidating his customers and destroying his patronage."

It is apparent that the supreme law of the land guarantees protection to all who desire to engage in a lawful calling. And while the ultimate object of the boycott and picketing under consideration may have been to thereby increase the force and power of the union and for the betterment of its members, it is not to be disguised that its immediate object was to intimate and coerce appellant to sign a contract he was unwilling to sign and that he was under no legal obligation to sign. To construe the evidence otherwise would be but to adopt a subterfuge, and this we cannot do. It is immaterial, therefore, that appellees' ultimate object in ordering and carrying on the picketing may have been lawful; for, as said in the case from which we have before quoted at some length:

"The law looks to the immediate, and not the incidental, object of the combination. If the immediate object is unlawful, the combination is unlawful."

[4, 5] It is also immaterial that the defendants entertained no specific ill will toward appellant and acted without the specific purpose to injure him, as some of them testified. It seems clear that what was done had the inevitable effect of causing him injury to a material extent, and it must be held as a matter of law that defendants intended the injury that resulted. And inasmuch as the acts complained of constituted an invasion of appellant's rights and were voluntarily and knowingly done, it must be further held that defendants, in a legal sense, acted maliciously. Malice, in a legal sense, denotes wrongful act intentionally done without just cause or excuse. In Ramsey v. Arrott, 64 Tex. 381, the following definition of malice by Mr. Greenleaf was approved:

"Any unlawful act, done willfully and purposely, to the injury of another, is, as against that person, malicious."

See, also, Culbertson v. Cabeen, 29 Tex. 247, and, as applied in a case similar to the one before us, see, also, Lohse Patent Door Co. v. Fuelle, 215 Mo. 421, 114 S. W. 997, 22 L. R. A. (N. S.) 607, 128 Am. St. Rep. 492.

[6] But we will no longer discuss specific contentions or treat the case from the general viewpoint of the authorities, but will content ourselves with stating our general conclusion that, notwithstanding some conflicts in the adjudicated cases, the great weight of authority seems to support appellant's right to injunctive relief. See the following cases where the subject in all of its phases is discussed: Olive et al. v. Van Patten, 7 Tex. Civ. App. 630, 25 S. W. 428; Jensen v. Cooks', Waiters', etc., Union, 39 Wash. 531, 81 Pac. 1069, 4 L. R. A. (N. S.) 302; My Maryland Lodge, etc., v. Jno. B. Adt, 100 Md. 238, 59 Atl. 721, 68 L. R. A. 752; Erdman v. Mitchell et al., 207 Pa. 79, 56 Atl. 327, 63 L. R. A. 534, 99 Am. St. Rep. 783; Vegelahn v. Guntner et al., 167 Mass. 92, 44 N. E. 1077, 35 L. R. A. 722, 57 Am. St. Rep. 443; Sherry v. Perkins, 147 Mass. 214, 17 N. E. 307, 9 Am. St. Rep. 689; Cœur D'Alene, etc., Min. Co. v. Miners' Union et al. (C. C.) 19 L. R. A. 382, 51 Fed. 260; Chicago Typo. v. Franklin Union No. 4, unreported case, but affirmed in 220 Ill. 355, 77 N. E. 176, 4 L. R. A. (N. S.) 1001, 110 Am. St. Rep. 248; Atchison, etc., Ry. v. Gee (C. C.) 139 Fed. 582; United States v. Cassidy et al. (D. C.) 67 Fed. 698; Lohse Pat. Door Co. v. Fuelle, 215 Mo. 421, 114 S. W. 997, 22 L. R. A. (N. S.) 607, 128 Am. St. Rep. 492; Goldberg v. Stablemen's Union, 149 Cal. 429, 86 Pac. 806, 8 L. R. A. (N. S.) 460, 117 Am. St. Rep. 145, 9 Ann. Cas. 1219; Jordahl v. Hayda, 1 Cal. App. 696, 82 Pac. 1079; Allis Chalmers Co. v. Iron, etc., Union (C. C.) 150 Fed. 170; Casey v. Cincinnati Typo. Union (C. C.) 45 Fed. 135, 12 L. R. A. 193; Wilson et al. v. Hey et al., 232 Ill. 389, 83 N. E. 928, 16 L. R. A. (N. S.) 85, 122 Am. St. Rep. 119, 13 Ann. Cas. 82; Geo. Jonas Glass Co. v. Glass Blowers' Ass'n, 77 N. J. Eq. 219, 79 Atl. 262, 41 L. R. A. (N. S.) 445; Hitchman Coal

& Coke Co. v. Mitchell et al., 245 U. S. 229, 38 Sup. Ct. 65, 62 L. Ed. 260; Ex parte Stout (Tex. Cr.) 198 S. W. 967.

But yet for another reason we think the judgment below is erroneous. We are of opinion that the acts of the appellees as alleged by appellant and as shown by the undisputed evidence fall within the prohibitory effect of our anti-trust statutes.

[7] The statutes referred to may be found in their codified form in title 130, 4 Vernon's Sayles' Tex. Civ. Stats. p. 4808 et seq. We quote therefrom so much as is believed to have application. By article 7796, c. 1, of the title a "trust" is defined as:

"A combination of capital, skill or acts by two or more persons, firms, corporations or associations of persons, or either two or more of them for either, any or all of the following purposes: To create, or which may tend to create, or carry out restrictions in trade or commerce or aids to commerce or in the preparation of any product for market or transportation, or to create or carry out restrictions in the free pursuit of any business authorized or permitted by the laws of this state."

Article 7799 declares that:

"Any and all trusts, monopolies and conspiracies in restraint of trade, as herein defined, are prohibited and declared to be illegal"

As it seems to us, the acts of appellees plainly come within the meaning of a trust as above defined. They combined in open meeting and formally initiated and carried into effect the picketing of appellant's premises as shown by the evidence. The direct, the immediate, object in so doing seems just as certainly to have been to create and carry out restrictions in the free pursuit by appellant of his business, which was a lawful one. We must know from the evidence that such was the effect.

[8] It is perhaps possible that it may be said that the expressed view of the anti-trust statute is at variance with our statutes relating generally to labor and labor organizations. But not so; on the contrary, as we think, the labor laws referred to give force to the construction given. Those laws, after providing that it shall be lawful for persons engaged in any kind of labor to associate themselves together and form unions, etc., make the following declaration relating to the rights and privileges of such associations. viz.:

"It shall not be held unlawful for any member or members of such trades union or other organization or association, or any other person, to induce or attempt to induce by peaceable and lawful means, any person to accept any particular employment, or quit or relinquish any particular employment in which such person may then be engaged, or to enter any pursuit, or refuse to enter any pursuit, or quit, or quit or relinquish any pursuit in which such person may then be engaged; provided, that such member or members shall not have the right to invade or trespass upon the premises of another without the consent of the owner thereof." Article 5245.

The next succeeding article of the statute (article 5246) contains, among others, the express proviso:

"That nothing herein contained shall be construed to repeal, affect or diminish the force and effect of any statute now existing on the subject of trusts, conspiracies against trade, pools and monopolies."

It is apparent that article 5245 is without application here. The right and privileges there granted apparently relate to cases of the ordinary strike so familiar to the public, where the controversy is between an employer and his employés. But there is no controversy of the kind here. So far as the record shows, appellant and his employés are in entire harmony. Appellant has discharged no employé nor retained one objectionable to the other employés. Nor does it appear that any one or more of appellant's employés are dissatisfied with appellant's government, with the wages paid, or hours of service required. So that the question is narrowed to the simple one of whether in enacting article 5245 it was the legislative purpose to authorize any character of coercion or intimidation to compel a person in business necessitating the employment of servants to employ such persons only as shall be designated by another person or association of persons, and to permit such other person or association to dictate the rate of wages to be paid, the number of hours to serve, etc. We do not think so. The right of a citizen in this free republic to conduct any lawful business in any lawful manner that he may think best in view of his situation and circumstance is too important to yield at the behest of any private person or association organized to promote the interest of but a single class of our people, laborers though they may be. Indeed, to impose restrictions upon the freedom of the business world in favor of any particular class of labor is by no means necessarily beneficial to the perhaps larger number of laborers, who either cannot or who do not wish to conform to the rules of the organizations, or whose necessities or situation may require employment at schedules of wages or hours forbidden by the organized bodies.

At all events the privileges extended by article 5245, so far as they may be construed as limitations upon freedom in business pursuits, ought not, as it seems to us, to be extended to circumstances such as we now have before us, and thus run counter to our anti-trust statute expressly forbidding combinations to "create or carry out restrictions in the free pursuit of any business."

We conclude that both by the weight of authority and by virtue of our anti-trust statutes the judgment below was wrong, and that it should be reversed, and here rendered for appellant; that the writ of injunction forthwith issue as prayed for. It is further ordered that all costs be taxed against appellees, and that this judgment be certified below for observance.

Reversed and rendered.