**FEATHERSTONE v. INDEPENDENT SERVICE STATION ASS'N OF TEXAS et al. (No. 10338.)**

Court of Civil Appeals of Texas. Dallas. July 28, 1928.

Rehearing Denied Oct. 13, 1928.

Hughes & Monroe, of Dallas, for appellant.
Callaway & Reed, of Dallas, for appellees.

LOONEY, J. M. B. Featherstone, who operates a general garage business in the city of Dallas, and deals in oils and gasoline, brought

this suit against the Independent Service Station Association of Texas, a corporation, the Independent Service Station Association of Dallas, an unincorporated association, and C. M. Proctor, R. E. Tomlinson, and E. L. Haskins, individuals, who are engaged in the same line of business as that pursued by plaintiff, to enjoin an alleged lottery scheme employed by the defendants to attract business and trade from plaintiff to the injury of his property and property rights involved in said competing business.

The case, by agreement, was withdrawn from the jury and submitted to the trial judge, whose findings of fact and conclusions of law are, in substance, that, the defendants, other than the defendant corporation, had, for eight or nine months prior to the institution of the suit, operated, and caused to be operated in Dallas county, a scheme by which automobiles, as prizes, were distributed by chance in substantially the following manner: That is to say, the Independent Service Station Association of Dallas, a voluntary association of retail dealers, including the individuals, defendants herein, through its officers and committees, sold tickets to the members of the association for a money consideration used to purchase automobiles that constituted the prizes at the drawings. That the retail dealers composing this association, including the individual defendants, advertised to the general public that purchasers of merchandise and service from them would receive a ticket for each dollar spent, entitling the holder to a chance to win an automobile. That, when a ticket was issued, a stub, containing a number corresponding to that on the ticket, was retained, and, at the end of stated periods, these stubs were placed in a receptacle and a drawing therefrom was had by chance, and the holder of the ticket corresponding in number to that on the stub drawn won the prize and received the automobile.

The court found: That the defendants were operating this scheme at the time the temporary injunction was issued in this cause, and that they threatened to continue its operation. That they changed the mode of operations to this extent, they not only gave out tickets to customers who bought merchandise, but in some instances to individuals who were not purchasers. That defendants had distributed many prizes in this manner, and had advertised a drawing for a Chrysler car to take place May 23, 1928. That the admitted purpose of such scheme was to attract trade from competitors who did not participate in the scheme and to build up their own business.

The court found: That plaintiff was a competitor of the defendants in the sale of oil, gasoline, and in the general garage business, and that members of said association had opened up places of business immediately surrounding that of plaintiff, at which they displayed advertisements to the effect that customers would receive chances on automobiles by patronizing their places. That various prospective customers of plaintiff left his place without making purchases, on discovering that he did not distribute tickets for the automobile drawing, and that, since and during the operation of the scheme, plaintiff's business declined, he lost money, whilst the defendants' business increased and they made money as the result of the scheme.

The court concluded that the facts showed the existence of a lottery in violation of the penal statutes of the state; that every element of the offense existed—that is, a prize to be distributed, by chance, to the holder of a ticket, who acquired the same on a consideration.

Paragraphs 3 and 4 of the court's legal conclusions are as follows:

"(3) I find that the plaintiff has no property rights involved in the crime committed by the defendants and each of them, and loss of trade and patronage by the plaintiff, caused by the defendants, does not constitute injury to property rights. In this connection, I find that general business, commonly known as 'trade,' coming from the general public in the form of patronage, is entitled to go into whatever channel it deems fit, and, although said scheme and device directly injures the plaintiff financially in the operation of his business, that same does not constitute such unfair competition that plaintiff has a legal cause to complain by asking an injunction.

"(4) I further find that the plaintiff, M. B. Featherstone, is not entitled to equitable relief in the form of a permanent injunction for the reason hereinabove stated, to wit, that his property rights are not affected as the term 'property right' is construed by this court, and that the plaintiff has an adequate remedy at law, to wit, protection by the criminal courts, and that the plaintiff's adequate remedy would be to file a criminal complaint against the defendants herein in the event he desires to do so."

In harmony with the court's legal conclusions, judgment was rendered denying plaintiff the relief sought, from which this appeal is prosecuted.

Plaintiff's contention in effect is this, that his property and property rights (that is, his business and the right to operate the same without unlawful interference, invasion, or injury) were violated by the lottery scheme conducted by defendants, and therefore he was entitled to the injunctive relief sought, notwithstanding the fact that the lottery constituted a violation of the Penal Code of the state.

Lottery as an offense was unknown to the common law, and only within recent times the scheme was not only tolerated, but employed as a convenient method of raising revenue for governmental, religious, charitable, and educational purposes. Experience, however, demonstrated that the practice was demoralizing in arousing and cultivating the

gambling instinct dormant in all human nature, was widespread, casting a baneful influence over entire communities, reaching persons of all ages and classes, entering every fireside, preying especially upon the meager means and earnings of the poor, attracting especially the simple and ignorant, and leading at last to idleness, mendicancy, moral profligacy and debauchery. In view of its malign and demoralizing influence, the lottery has been outlawed in probably every state in the Union, and all propaganda, with reference to such enterprises, has been banished from the mails and interstate commerce, by acts of Congress.

The people of this state were so intent on outlawing the lottery, they refused to commit the subject to the discretion of the Legislature, but commanded, in section 47, art. 3, of the Constitution that:

"The Legislature shall pass laws prohibiting the establishment of lotteries and gift enterprises in this state, as well as the sale of tickets in lotteries, gift enterprises or other evasions involving the lottery principle, established or existing in other states."

In obedience to this mandate of the people, the Legislature enacted the following penal statute (article 654, Penal Code):

"If any person shall establish a lottery or dispose of any estate, real or personal, by lottery, he shall be fined not less than one hundred nor more than one thousand dollars; or if any person shall sell, offer for sale or keep for sale any ticket or part ticket in any lottery, he shall be fined not less than ten nor more than fifty dollars."

It will be observed that the lottery prohibited by this statute is not defined, but the courts of the country are in general accord in regard to the definition and constituent elements of the offense.

A satisfactory definition is given in State v. Lipkin, 169 N. C. 265, 271, 84 S. E. 340, 342, L. R. A. 1915F, 1018, 1022, Ann. Cas. 1917D, 137, as follows:

"A lottery, for all practical purposes, may be defined as any scheme for the distribution of prizes, by lot or chance, by one, on paying money or giving any other thing of value to another, obtains a token, which entitles him to receive a larger or smaller value or nothing, as some formula of chance may determine."

■ The findings of the trial court in the case under consideration and the undisputed facts fill up to the fullest measure the above definition. They are to the effect that the Independent Service Station Association of Dallas sold to its members, including the individual defendants, tickets in batches of 1,000 that were distributed by the dealers to their customers, one ticket, for every dollar's worth of merchandise purchased, that entitled the holder to a chance to win an automobile at a drawing to be held; thus is revealed all the essential elements of a lottery —that is, the prize, the chance distribution of same, and the consideration passing from the holder of the ticket.

Appellees, however, do not seriously contend that the scheme above outlined was not a lottery within the meaning of the statute, but by appropriate cross-assignments of error challenge the correctness of the findings of the trial court, to the effect that defendants were operating under a lottery scheme at the time the restraining order was issued. Their contention is that the undisputed facts show that this scheme had been abandoned prior to the institution of the suit, and that the scheme, under which they were then operating, was a perfectly legal and permissible procedure.

They insist that, under the plan as changed, instead of giving to customers a ticket for each one dollar's worth of merchandise purchased, defendants and other members of the association, for the purpose of advertising their business as independent oil and gas dealers, and to promote good will among customers, gave tickets that entitled the holder to a chance to draw an automobile, that these tickets were given indiscriminately, to whomsoever they pleased, to customers and noncustomers as well; hence this new scheme was lacking in one of the essential elements necessary to constitute a lottery, to wit, the consideration.

■■ We readily agree to the correctness of the proposition that, if tickets given by defendants and other members of the association were gifts, unsupported by a consideration moving from the ticket holder, were in fact gratuities pure and simple, the lottery statute was not violated, for the evident reason that a person is at liberty to give away his property, by chance, at a drawing to ticket holders, or in any other manner, without violating the law. But is the case at bar of that nature? We do not think so for the following reasons: The change wrought as testified to by defendants was not a change in the scheme itself, but merely in the procedure or method of executing the same. Instead of giving a ticket to a customer for every dollar's worth of merchandise purchased, they gave tickets to whomsoever they pleased—customers and noncustomers as well. On this point, O. M. Proctor, one of the defendants, testified:

"The purpose of this scheme is to draw business; to get all the business we can; to draw business from our competitors. We have now changed our plan of operation. It was not because we were enjoined by the court. We did not change our plan because of any court action. We do not intend to give any more automobiles away under that plan. Our plan now is to give tickets to our various customers; to issue tickets to whomsoever we see fit; if they come in to get water or gas; if we want to give them to our patrons, and others. We threatened at this time to give a car away on May

24 (1928) by giving chances to customers. * * * These tickets are to be given patrons and customers. Yes; we are going to give them to our customers. * * * I take the tickets under the present plan, and, when the customers come in to buy merchandise, I give them a ticket. I do not give every one a ticket. We give to those whom we see fit. We give them whether they buy or not. One of the purposes is to advertise, and we give the tickets out as an advertisement. Under this new plan we have a drawing, and the winning number gets the prize. That is the plan we will attempt to use."

Mr. R. E. Tomlinson, one of the defendants, after testifying that he and Messrs. Proctor and Haskins (also defendants) constituted the committee that acted for the Independent Service Station Association in handling the matter of purchasing automobiles, etc., said:

"Our intention is to enforce this new plan (the new plan of procedure); to make the men live up to it just like they have to live up to the by-laws and constitution of the association. * * * The purpose of our entire scheme is to draw business. It is an advertising proposition to take away business from others. That is the whole proposition, like any other advertising, to get business. It has worked very satisfactorily. * * * I haven't changed my mind that the purpose of advertising is getting good will for the independents, and that a man would buy for the purpose of getting a chance. We have abandoned the other plan we had. Now we have a new plan; we have a prize. The men buying the prize are members of the Independent Service Station Association of Dallas. They sell tickets to the members of this association for money. They buy these chance tickets from the committee for money, and the money goes into the general fund to buy the prize, the car. The purpose of the scheme is to promote good will, but when the dealer pays for the tickets, buys them, one of the purposes of it is to give the tickets away to the fellow that comes into the station. That is one of the purposes. Then, when these dealers that buy these tickets give them away, they are all put in a receptacle, and there is a drawing, and the ticket that is drawn gets the automobile. They draw seven tickets. That is the scheme we intend to follow."

This testimony fails to show any material change in the scheme as originally operated, but reveals a change simply in the plan of its operation. While dealers, under the new plan, distributed tickets to noncustomers as well as to customers, it seems that the scheme was to distribute tickets, in the main to customers, as the evidence discloses that only a few, negligible in number, were given to persons other than customers. That the giving of tickets, and the drawings and distribution of prizes, were inducements to patronage and unquestionably lured customers, is shown from the very satisfactory business results that followed. Patronage thus induced was the consideration that passed from the ticket holder for the chance received, in that the price paid, whatever it was, the amount being immaterial, constituted the aggregate price for the merchandise or service and the ticket that represented a chance to win the prize; in other words, for one undivided price both were purchased, the merchandise, or service, and ticket, the ticket being as much bought as though priced separately. State v. Danz, 140 Wash. 546, 250 P. 37, and annotations 48 A. L. R. 1109, 1122. We are of the opinion, therefore, that the court did not err in concluding that the facts constituted a lottery within the meaning of the law.

The court, however, denied plaintiff relief, on the idea that his property rights, as that term was construed by the court, were not affected, and further that he had an adequate remedy, in that, he could institute criminal prosecutions against defendants.

When and under what circumstances will a court of equity exercise authority to prevent the commission of crimes? The general rule is that, except as conferred by statute, courts of equity have no criminal jurisdiction, and acts or omissions will not be enjoined merely on the ground that they constitute violations of penal statutes.

Notwithstanding this is the general rule, it is also well settled that, when necessary to protect civil or property rights, equity will interfere, and the fact that the commission of a statutory offense must be enjoined, as an incident to the giving of proper relief, will not deprive the court of its jurisdiction in this respect.

An apt statement of the law on this point was made by Judge Neill in State v. Patterson, 14 Tex. Civ. App. 465, 469, 37 S. W. 478, 479, as follows:

"It is only when property or civil rights are involved and an irreparable injury to such rights is threatened or is about to be committed, for which no adequate remedy exists at law, that courts of equity will interfere by injunction for the purpose of protecting such rights. The injury threatened to such rights may, if committed, constitute a crime, and subject its perpetrator to punishment under the criminal law; yet, as his punishment would furnish him whose property or civil rights have been irreparably injured by the acts constituting the offense no compensation for such injury, courts of equity will interfere to prevent such an injury, notwithstanding the commission would constitute a criminal offense, not because it would be a crime, but because the injury to such rights would be irreparable. It cannot be said that such interference by a court of equity is an invasion of the domain of the criminal law, for no crime has been committed where equity interposes its arm for the protection of property or civil rights. In extending such protection, it may prevent a crime; but, as no one has a right to commit crime, no one should be heard to complain that he is restrained from its commission, when such restraint has been exercised in the jurisdiction of a court for the purpose of preventing him from

irreparably injuring another in his property or civil rights."

. This doctrine was approved by the Supreme Court of the United States in Re Debs, 158 U. S. 593, 15 S. Ct. 900, 39 L. Ed. 1106. Also see 32 C. J. p. 277, § 440.

We do not agree with the trial judge in his legal conclusion to the effect that plaintiff has no property rights involved in the offense committed by defendants.

■■ We are of the opinion that plaintiff's business and his right to conduct the same constitute property that a court of equity will protect from unlawful interference or injury. The correctness of this proposition has been announced so often and by so many courts that it ought not now to be considered an open question. While it is true a dealer has no such interest in the future trade, that is, in possible customers, as would justify an appeal to a court of equity, to restrain a competitor from doing what is perfectly legal, to advertise and attract customers to his own business, although such conduct may result in a corresponding loss to one engaged in a similar business, yet a competitor may ask for the restraint of acts and conduct prohibited by law, that unreasonably interfere with, divert patrons from, and injure his business. The correct rule on this subject was announced by Judge James, in Robison v. Texas Pine Land Association (Tex. Civ. App.) 40 S. W. 843, 844, in the following language:

"According to plaintiff's allegations, competition in trade existed between plaintiff and defendant, and it was legitimate for defendant to appropriate to itself all the customers it could command, even to the extent of driving plaintiff out of business, provided the means used for that purpose did not contravene any law, or violate a definite legal right of the plaintiff."

To the same effect, see Pierce v. Society, etc., 268 U. S. 510, 45 S. Ct. 571, 574, 69 L. Ed. 1070, 39 A. L. R. 468.

The correctness of the proposition that one may confidently appeal to a court of equity for protection against an unlawful interference with and injury to his business was affirmed in the following cases: Truax v. Corrigan, 257 U. S. 312, 42 S. Ct. 124, 127, 66 L. Ed. 254, 27 A. L. R. 375; Allgeyer v. Louisiana, 165 U. S. 578, 17 S. Ct. 427, 41 L. Ed. 835; Webb v. Cooks', etc., Union (Tex. Civ. App.) 205 S. W. 468; Cooks' Union v. Papageorge (Tex. Civ. App.) 230 S. W. 1086; Hawks v. Yancey (Tex. Civ. App.) 265 S. W. 233, 238, 239; Glover v. Malloska, 238 Mich. 216, 213 N. W. 107, 52 A. L. R. 77.

In the case of Glover v. Malloska, supra, certain dealers sought to enjoin a competitor from executing a lottery scheme very similar to the one under consideration. Responding to the contention there made, that plaintiffs had no property rights involved that a court of equity would protect, the court said:

"Have plaintiffs property rights of a pecuniary nature here involved? It would astound the business world to hold that an established business is barren of property rights of a pecuniary nature. Merchants, and others engaged in business, feel that they have property rights therein, and we must hold that an injury to such rights, through criminal acts, is an injury to property rights of a pecuniary nature.

"No one should be permitted to employ criminal means in trade rivalry. The law proscribes a lottery, and those injured thereby in their rights of property are not required to suffer successive inflictions of pecuniary injury until a criminal prosecution is launched. Courts do not depart from the rule that equity may not interfere, except to protect property rights of a pecuniary nature, in enjoining criminal acts exercised by one dealer to enhance his sales to the calculated pecuniary injury of a law-abiding competitor. Defendant Malloska adopted the lottery scheme for profit, admits its employment increased his sales, and plaintiffs established the fact that such increase was directly traceable to their loss of customers."

■ That plaintiff's business, in the case at bar, was interfered with and injured, as a direct result of the operation of the lottery scheme conducted by defendants, is shown by the undisputed facts and the unchallenged findings of the trial court.

Article 4642 (4643) (2989), R. S. 1925, authorizes the issuance of injunctions:

"(1) Where the applicant is entitled to the relief demanded and such relief or any part thereof requires the restraint of some act prejudicial to him."

If we are correct in the conclusions announced above, plaintiff was and is entitled to have his business protected from unfair competition produced by the unlawful means employed by his competitors, and it seems that the only adequate remedy, appropriate and suited to the conditions with which we are dealing, is the restraint of the prejudicial acts of which plaintiff complains.

Plaintiff cannot successfully combat this competition except on the plane where the contest for business has been pitched, and this he cannot attempt, without himself becoming a violator of the law. The lottery scheme had been in operation eight or nine months at the time this suit was instituted, a number of drawings had taken place and prizes distributed thereunder, and, so far as the record discloses, without any effort having been put forth for its suppression. The Independent Service Station Association of Dallas at that time had 86 members, operating 108 oil stations scattered over Dallas county, most of them located in the city of Dallas. In these circumstances, to invite plaintiff to seek relief from this unlawful competition by the institution of criminal prosecutions against the large number of individuals who are aiding and abetting the lottery, to assume the burdens and suffer the loss of time that attention to the prosecutions

would require, is to invite him to attempt the accomplishment of an Herculean, if not impossible, task. If this is plaintiff's only relief from the conditions in which his business is enmeshed, the statute, promising relief from prejudicial acts, is delusive, in holding out the word of promise to the ear only to disappoint the hope. The remedy, to be adequate, must be applied at the source of the evil, the association, the head and front of the offending, as well as the individual members sued, must be enjoined from further operations under the lottery scheme.

We find no evidence that connects the Independent Service Station Association of Texas, the corporation, with any participation in the operation of the lottery; hence the judgment below will be affirmed as to that defendant, but, as to each and all of the other defendants, the judgment below is reversed, and judgment here rendered for plaintiff granting the relief sought.

Affirmed in part; reversed and rendered in part.