## HAWKS v. YANCEY.  (No. 9360.)

(Court of Civil Appeals of Texas. Dallas. July 5, 1924.)

**1. Injunction ⪪137(1)—Agreement between trial judge and defendant held not basis for denial of temporary injunction.**

Verbal agreement between attorney for defendant and court, to effect that defendant would not do things or be guilty of conduct complained against, was not proper basis for denying temporary injunction, if plaintiff made showing justifying temporary injunction.

**2. Injunction ⪪94—Equity will protect one against assault, slander, and importunity.**

Equity will intervene to protect female assaulted, slandered, and importuned, although no property rights are involved, especially in view of Rev. St. art. 4643.

**3. Injunction ⪪9—Statute held not referable to principles of equity.**

Rev. St. art. 4643, has no relation and is not referable to principles of equity, but provides additional grounds for injunctive relief.

**4. Injunction ⪪9—May be granted to protect personal rights though property is not involved.**

Under Rev. St. art. 4643, courts may grant injunctions protecting personal rights, though property is not involved.

**5. Injunction ⪪94—Lies to prevent slander, espionage, and unwelcome imposition upon another upon public streets.**

Injunction lies to protect woman from person with whom she had had illicit relations, who is making statements against her, watching over her, imposing himself upon her on public streets, making false charges to public officials, preventing her marriage to another, notwithstanding liberty of speech and press, in view of Bill of Rights, § 19.

Appeal from District Court, Dallas County; Royal A. Watkins, Judge.

---

⪪For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Action by Josephine V. Hawks against Robert S. Yancey. From an order refusing temporary injunction, plaintiff appeals. Reversed and remanded, with instructions.

J. D. Kugle and Rasbury, Adams & Harrell, all of Dallas, for appellant.

Alexander Pope, of Dallas, for appellee.

LOONEY, J. This appeal is from an order of the trial court refusing appellant's petition for the issuance of a temporary writ of injunction.

Appellant, Miss Josephine V. Hawks, brought this suit against appellee, Dr. Robert S. Yancey, for damages, actual and exemplary, and for injunction, temporary and permanent.

The substance of appellant's cause of action as presented in her sworn petition is that, during the year 1916 she entered St. Paul's Sanitarium, an institution of the city of Dallas, Tex., as a student nurse, from which she graduated three years later and continued, after graduation, as a nurse in the institution; that while a student there, being about 18 years of age, she met appellee, who visited the sanitarium professionally; that appellee was at the time a man about 40 years of age, having a wife and two sons, was an accomplished eye, ear, nose, and throat specialist, enjoyed a lucrative practice, was well educated, an accomplished conversationalist, attractive, persuasive, and of eminent social and business standing; that appellee, with lecherous and lustful design, began a course of deceptive and fraudulent conduct towards appellant, for the purpose and with the view of seducing, debauching, and making her his paramour; that he paid appellant most assiduous and delicate attentions, showering upon her gifts of flowers, perfumes, candies, and arranged dinner parties in order to be in her company, persuaded her to take automobile rides with him, protesting that he was her friend and would not ask her to do anything improper. He paid appellant delicate compliments, telling her she was beautiful, that he loved her, that he never had happiness at home, that he and his wife were estranged and really separated, that his wife had gone to their summer home in the state of Maine and would not return, and that it was his intention to procure a divorce and make appellant his wife. Appellant believed what appellee told her and, because of these assiduous and delicate attentions and professions of love, also learned to love him, trusted him implicitly, and, in this frame of mind, she yielded herself to and was seduced and debauched by appellee in his private office in the Wilson building on July 21, 1918. Thereafter, under the promise, repeatedly and continuously made, that he would procure a divorce from his wife and marry appellant, she continued to meet and be with appellee at various places; lived with him as his wife at various hotels in the cities of Dallas, San Antonio, Waco, Corpus Christi, Fort Worth, and Denver, Colo.; that this criminal intimacy continued from July 21, 1918, until the month of September, 1923. Appellant became impatient about appellee's procrastination in carrying out his promise often made to divorce his wife and marry her, and had become insistent, telling him that she had wasted six years of her life with him, had had none of the pleasures of girlhood nor of married life, was ostracized and could not go or be with him except when they would slip away and be in hiding; and that she would no longer continue this relation, would not meet or see him again, and would no longer live under such a cloud.

Appellee, in order to perpetuate this sinful relation and to further seduce and debauch appellant, began a passionate campaign of letter writing and telephone conversations, couched in the most affectionate and endearing language, telling appellant of his great love for her, that he could not live without her, that she was the only one he had ever loved, etc.; but she continued to repulse and evade him, and reiterated her determination to cease the life she had been living.

That about October 23, 1923, appellant met a Mr. Harold Clark, a reputable gentleman, who was a patient at St. Paul's Sanitarium, appellant being his nurse during convalescence from an operation that he had undergone, and they became friends, which ripened later into mutual affection and an engagement to marry.

That appellee continued to pursue appellant by telephone calls, by letters declaring his love and importuning her to see him and talk with him just once more. To this appellant finally consented, and, in the interview, begged appellee to desist and not further embarrass and humiliate her, that she was engaged to be married to a reputable man who loved her, and that she loved him, and that she believed he would make her a good husband, and appealed to appellee not to pursue her further, that it might get to the ear of Mr. Clark and cause their engagement to be broken off; that his further pursuit of her and his importunities would be of no avail, as she had finally and conclusively broken with him and intended to marry Mr. Clark. Thereupon, appellee became infuriated, threatened to break up her prospective marriage with Mr. Clark by exposing her to him, and threatened to expose her to her sisters and at the sanitarium where she worked as a professional nurse; that he would humiliate, embarrass, and utterly destroy her unless she returned to their former life and submitted herself to his demands and desires, offering in this connection to give her a home of her choice in the city of Dallas and that

he would make a generous provision for her if she would continue this sinful relation. This she rejected, and appellee thereupon began, by artifices and threats, to persecute, humiliate, and destroy appellant. On one occasion appellee, being alone at his home, feigned sickness and importuned appellant to come to him. This she refused, but secured for him another nurse. He also called in a physician and had the nurse in charge telephone appellant that he was sick, and continually called for her, and the nurse urged appellant to come, stating that it was a small favor to grant, and, being thus importuned, she went to the home of appellee, and, after reaching his presence, he begged her not to marry Mr. Clark and to resume their former relations, and, on her firm refusal, appellee assaulted, choked, cursed, and abused her.

In furtherance of his threats and formed design to expose and destroy her, appellee visited Mr. Harold Clark, who was to him a perfect stranger, and revealed to him in great detail the relations that had formerly existed between appellant and appellee, telling Clark that appellant was an adulteress and an unfit person for him to marry, and, by reason of this conduct on the part of appellee, Mr. Clark broke the marriage engagement with appellant, to her great humiliation, pain, and anguish of mind.

In furtherance of this wicked design, appellee, during the month of February, 1924, while appellant was in her car on the streets of Dallas, imposed himself, unbidden, upon her, forced himself into her car, snatched from her her purse and took from the car the keys thereof and refused to return these articles, but left, going to his office, forcing appellant, in order to recover these articles, to follow him, begging for their return; and, when his office was reached, he closed the door and physically assaulted appellant, choked and beat her, and later went to Capt. W. R. Moffett, of the detective force of the city of Dallas, and falsely informed this official that appellant was a blackmailer, that she had run into his office demanding that if he did not pay her money she would expose him to the public, would telephone his wife and destroy his home and business, and requested this official to demand that appellant desist from her blackmail under the threat of arrest and exposure; that said officer, believing the false statements of appellee, visited the place where appellant was boarding, and there, in the presence of the lady of the house, charged appellant with being a blackmailer and threatened to arrest her, as the results of which she suffered great fear, shame, humiliation, and mental anguish, was rendered nervous and sleepless, and her health impaired.

On another occasion, seeing appellant on the streets of the city of Dallas, appellee pointed her out to a policeman, saying: "There she goes now; arrest her."

That about March 2, 1924, near the noon hour, appellant parked her car on a busy commercial thoroughfare of the city of Dallas, and, on returning to it, found appellee in the same, and, after being requested to leave, he refused and again threatened, intimidated, and put appellant in great fear for her life and safety, and did not leave until friends of appellant called police officers to come to her relief and to accompany her home.

That in March, 1924, appellee went to Dan Harston, sheriff of Dallas county, and Shelby Cox, district attorney of Dallas county, and to these officials made the false charge against appellant that she was a blackmailer, that she had endeavored to extort money from him under the threat that she would destroy his home and business, stating to these officers that appellant should be arrested and charged with the crime of blackmail. Believing these false charges, the district attorney called for appellant over the telephone at the place where she was stopping, left his number, with direction that appellant call him later, and, on being called by appellant, the district attorney stated that she had been charged with the crime of blackmail and threatened her with arrest and confinement in jail, and invited her to his office to discuss the matter before beginning prosecution. All this caused appellant renewed and continued mental suffering, humiliation, embarrassment, restlessness, and nervousness.

In further pursuit of his design to destroy and ruin appellant, appellee, during the month of March, 1924, went to the Mother Superior at St. Paul's Sanitarium, where appellant at the time was in good standing and employed as a professional nurse, earning approximately $200 a month, and wickedly, corruptly, and falsely informed the Mother Superior that appellant was charged with a criminal offense; that she would be exposed in the newspapers as being involved in a blackmailing scheme; that she was corrupt, unfit to be connected with the institution, and would bring discredit upon it. The Mother Superior, believing these false and slanderous accusations ordered appellant never to put her foot in the institution again; that she had, by reason of this alleged conduct, forfeited her diploma, which the Mother Superior demanded should be surrendered by appellant; and, further, that she would be disbarred from membership in the Nurses' Association; and thus, by these wicked, false, and fraudulent accusations brought by appellee against her, she was deprived of her right to follow her profession and to earn a living, lost her affiliation with the sanitarium. and the Nurses' Association, all to her great embarrassment, mental anguish, and great financial loss.

Appellant further alleged that appellee causes her to be continually followed, pursued, watched, and shadowed wherever she goes; that he has eavesdroppers to listen in on all her conversations over the telephone; that he calls, and has others to call, over the telephone where she lives, and, when the telephone is answered, no one replies; that these things and each of them, constitute a constant annoyance and harassment to appellant, causing her great worry, nervousness, excitement, and fear, destructive of her peace and rest; and that she fears appellee will, directly or indirectly, do her bodily harm.

Appellant prayed for injunction pendente lite, restraining appellee from, either directly, or indirectly, calling the telephone where she lives, from communicating or attempting to communicate with her in any manner, from accosting her on the streets or at any other place where she may be, from hounding, pursuing, watching, following, or shadowing her, or causing the same to be done, and from eavesdropping or causing any one to eavesdrop on her personal and telephone conversations, and from further talking or writing to any person other that his attorneys or the attorneys of appellant, about or concerning her, or her association or relations with any person, and particularly with appellee; from further slandering, libeling, or defaming her, and from doing or causing her any physical or bodily injury.

The legal effect of appellee's sworn answer is a general demurrer and a general denial.

On the hearing for temporary injunction, in addition to the sworn allegations of the petition, the court heard the testimony of Harold Clark, Capt. Moffett, of the detective force, Dan Harston, sheriff, and Shelby Cox, district attorney. The testimony of these witnesses sustained the allegations of appellant's petition in the respects in which each was involved by the allegations stated above. Also the testimony of Jess D. Bonner, a police officer of Dallas, sustained the allegations of appellant's petition to the effect that on a Sunday afternoon in March, 1924, he, with another police officer, on call, went to where appellant was at the time and learned that she had been endeavoring to get away from appellee; that she was at the time excited, scared, and was taken to her home by these officers.

After the introduction of the evidence and argument on the hearing, the court, it seems, reached the conclusion that the temporary writ should be issued and, to that end, drafted such an order as he contemplated entering and furnished to the attorneys for the respective parties copies of same, as follows:

"May, —, 1924. Mr. Clerk: When the plaintiff shall have filed with you a good and sufficient bond conditioned in the sum of one thousand ($1,000.00) dollars, you will please issue a (temporary) restraining order against the defendant herein, restraining him from annoying the plaintiff in any manner, also restraining him from talking to the plaintiff in any manner, also restraining him from talking to any employer of plaintiff about her relations or associations with this defendant, and also restraining defendant from doing or causing the plaintiff any physical or bodily injury or threatening to do her any physical or bodily injury."

In conformity to the order, appellant executed bond in the amount, conditioned as required, and the same was filed with and approved by the clerk.

The court, however, did not enter the order as originally contemplated, but, in lieu thereof, and based upon the reasons recited therein, entered an order refusing the injunction, reading in part as follows:

"Entered as of May 13, A. D. 1924. On this day came on to be heard plaintiff's application for injunction in the above entitled and numbered cause and, both parties appearing in court by their respective attorneys, to wit. Rasbury, Adams & Harrell, and J. D. Kugle. for the plaintiff, and Alex Pope for the defendant, after the matters of fact as well as of law were submitted to the court, and after the argument of counsel, Hon. Alex Pope, attorney for the defendant Robert S. Yancey, stated to the court that, upon his professional honor as an attorney at the Dallas bar, the defendant will agree with the court not to interfere with the plaintiff, Miss Josephine V. Hawks, in any way, that he will in no wise do any of the things complained of in paragraph 24 of plaintiff's original petition, that is, to wit, he will not, directly or indirectly, call the telephone where the plaintiff lives, communicate with the plaintiff nor attempt to communicate with her in any manner, accost plaintiff on the street or at any place where she may be, hound, pursue, watch, follow or shadow plaintiff, or cause her to be hounded, pursued, watched or shadowed at any and all times or places, or eavesdrop on plaintiff, or cause any one to eavesdrop on her and her personal conversations and telephone conversations and listen in or be connected with her telephone conversations, or cause any one to listen in or be connected with her telephone conversation and calls from the telephone where plaintiff lives, or from any other telephone in Dallas county, Texas, from and over which she may seek to call and talk; and that defendant will not talk to or write any other person other than his attorney, or attorneys for plaintiff, about or concerning the plaintiff or her association and relation with any person and particularly with defendant, and the defendant will not further slander, libel or defame plaintiff nor do or cause her any physical or bodily injury."

The order then proceeds to state that in view of this statement, agreement, and promise of Hon. Alex Pope, attorney for Dr. Yancey, it was ordered, adjudged, and decreed by the court that the injunctive relief sought in plaintiff's petition be denied, from which order this appeal has been prosecuted.

[1] That the trial judge was convinced

that the showing made by appellant authorized and made it his duty to issue the temporary writ is shown by the fact that the form of the order therefor was prepared by him and copies furnished attorneys for the respective parties. The verbal agreement between Hon. Alex Pope, attorney for appellee, and the court, to the effect that Dr. Yancey would not in the future do, either directly or indirectly, the things or be guilty of the conduct towards appellant, particularized in said order, was not a proper basis for judgment. We do not call in question the perfect good faith of Mr. Pope in the representations made to the trial judge, but the right of appellant to the liberty, privileges, and immunities of citizenship involved should not be made to rest on such an unsubstantial basis. If she made a showing justifying the relief sought as found by the court —and in this we believe he was correct—she was entitled to the writ based on the decree of court, which, if violated, could be enforced by appropriate contempt proceedings. The agreement between counsel for appellee and the court afforded no legal protection to appellant; it could have been violated by appellee, with impunity, and there is no method of enforcing it. The evidence before the judge on the hearing should have determined the judgment to be entered, and not the verbal statement of counsel, however sincerely made.

[2] It is contended, however, that as no property rights of appellant were involved, equity will not intervene to protect purely personal rights, and, for this reason, there was no error in the judgment of the court refusing to grant the writ.

We do not believe this an accurate statement of the rule of equity, for, as stated in 14 R. C. L. § 72, p. 370:

"Although the jurisdiction of equity to grant an injunction is ordinarily regarded as confined to cases where rights of property are involved and as not extending to an exclusively personal right, yet, in many cases in which relief has been granted it would seem that, though the exercise of the power is nominally based on an alleged property right, the observance of the rule that equity will be limited to rights of property is in fact only a nominal one, the right to protect which relief is granted, being in reality merely personal."

The rule that equity will not afford relief by injunction except where property rights are involved is known chiefly by its breach rather than by its observance; in fact, it may be regarded as a fiction, because courts with greatest uniformity have based their jurisdiction to protect purely personal rights nominally on an alleged property right, when, in fact, no property rights were invaded. This is, in our opinion, as it should be, because the personal rights of citizens are infinitely more sacred and by every test are of more value than things that are measured by dollars and cents.

Such a rule, as said in the note to Chappell v. Stewart, 37 L. R. A. 783, makes "the system of equity suitable only to a semisavage society which has much respect for property but little for human life. Our equity jurisprudence does not quite deserve so severe a reproach. It does, indeed, do much for the protection of personal rights, although it has not been willing to acknowledge the fact but has persisted in declaring the contrary." In our opinion it is not necessary that our determination of this question should be based solely on principles of equity, for the reason that ample authority is given our courts by article 4643, Revised Statutes, to protect by injunctive relief both property and personal rights. Subdivision 1 of this article authorizes the issuance of writs of injunction "where it shall appear that the party applying for such writ is entitled to the relief demanded, and such relief or any part thereof requires the restraint of some act prejudicial to the applicant."

[3] This provision of the statute has no relation, nor is it referable, to the principles of equity, but provides additional grounds for preventive relief. This view is manifest, for another provision of article 4643 provides for the issuance of injunctions "* * * in all cases where the applicant for such writ may show himself entitled thereto under the principles of equity. * * *" Sumner v. Crawford, 91 Tex. 129, 41 S. W. 994; Southwestern Tel. & Tel. Co. v. Smithdeal, 104 Tex. 258, 136 S. W. 1049; Hinton v. D'Yarmett (Tex. Civ. App.) 212 S. W. 518.

[4] In view of the provision of article 4643 first quoted, it is our opinion that the courts of this state are not required to search for rights of property on which to base jurisdiction to grant injunctions protecting personal rights, but are free to grant such relief whether property is, or is not, involved.

It seems that at an early day the power of the Chancery Courts of England was hampered by the restriction that injunction could not issue to protect purely personal rights, but this limitation was removed by an act of Parliament in 1873 that gave power to the courts to grant injunction in all cases "in which it shall appear to the court to be just or convenient that such order should be made." This act of Parliament, although couched in very general terms, has been construed to remove the limitation on the power of the courts, and, under its provision, the courts of England are now entirely free to protect personal rights, including reputation, by injunction. 37 L. R. A. 787, note.

On the subject under discussion we find reference to this English act, and its effect in relieving the courts from the limitation on their power to protect purely personal rights, in 14 R. C. L. § 72, p. 371, as follows:

"This limitation, early ingrafted on the power to grant injunctive relief, has been removed in England where courts of equity are no longer required to search for rights of property on which to base their jurisdiction to grant an injunction, a statute having been passed enlarging the jurisdiction of such courts. In that jurisdiction it is now held that English courts are entirely free to grant injunctions to protect personal rights, including the right of reputation, and injunctions against libel are in fact granted."

These statutes, that is, the provision of article 4643, Revised Statutes, first above quoted, and the English act, although phrased differently, have substantially the same meaning and were evidently enacted to accomplish a similar purpose. As the English statute has been construed to authorize the courts to protect, by injunction, personal rights per se, in our opinion it is entirely reasonable to give to our statute a similar meaning.

Coming now to the discussion of the case, the question presented is: Did appellant make it reasonably to appear that she was entitled to the relief demanded and that such relief, or any part thereof, required the restraint of appellee? Appellant, as a citizen, has the right to the pursuit of happiness, to freedom to go unmolested where she may choose, freedom from restraint, freedom to pursue her lawful occupation, freedom to enjoy life, to reclaim her life from sin and debauchery, and to pursue and obtain happiness. These fundamental rights, privileges, and immunities, belonging to appellant, were, according to the record before us, repeatedly and persistently violated and outraged by appellee.

In the case of Ex parte Warfield, 40 Tex. Cr. R. 413, 50 S. W. 933, 76 Am. St. Rep. 724, relator had been enjoined by the district court from visiting or associating with plaintiff's wife, or going to or near her, and from writing or speaking to her or communicating with her, directly or indirectly, in any manner, and from interfering with plaintiff in his peaceful efforts to seek, talk to, or communicate with his wife. The injunction was disobeyed and relator held for contempt, and the case came before the Court of Criminal Appeals on habeas corpus. It was contended that the injunction violated the Constitution and the fundamental law of the land, in that, it was a restraint of the freedom of speech and the right of relator to the pursuit of happiness. These contentions were overruled. The court said, in part:

"It occurs to us, if the suit itself was maintainable, that the acts complained of were prejudicial to the plaintiff; indeed, that, by their continuation, the real object of the suit would be entirely frustrated; and that the court consequently had the power and authority to inhibit said defendant from interfering with plaintiff's wife, and that this was no interference with the inalienable rights of the citizen to go where he pleased, and to associate with whom he pleased, and to pursue his own happiness in his appointed way, provided such course of conduct did not interfere with another's right. 'He had a perfect right to so use his own as not to abuse another's.' Nor is there any inconsistency, when thus construed, between the freedom of speech and of the press and the integrity of the marital relation. The law is as much bound to protect the one as the other, and, when both can be construed in harmony, it is the duty of the courts to protect both."

Another case of similar import is Stark v. Hamilton, 149 Ga. 227, 99 S. E. 861, 5 A. L. R. 1041. In this case a minor girl had been debauched and was induced to abandon her home and live in adultery. The question was whether or not a court of equity would, in favor of the father of the girl, issue an injunction to prevent his daughter's association with the man who debauched her, and to prevent him from communicating with the girl, either by writing, telegraphing, telephoning, or through the aid or agency of another. The court, in sustaining the right to issue an injunction, among other things, used this language:

"The case under consideration differs on its facts from any case heretofore decided by this court and from any of the cases cited from other states. It in a sense involves both personal and property rights. The father has the right, under the statutes of this state, to protect his minor child, to be protected by her, and to have her reside in his home and with his family and to enjoy the comfort of her association and the advantage of her services. It is his moral and legal duty to support her in sickness and in health. Reformation of a wayward daughter is always possible, and her father has the legal and moral right to make the effort to save her, and in some measure lessen the reproach to his name and to the reputation of his family. It is difficult to understand why injunctive protection of a mere property right should be placed above similar protection from the continual humiliation of the father and the reputation of the family. In some instances the former may be adequately compensated in damages, but the latter is irreparable; for no more money consideration could restore the good name and reputation of the family, or palliate the humiliation of the father for the continual debauching of his daughter. Under the pleadings and the evidence the interlocutory injunction was properly granted."

On the right of a citizen to the pursuit of a lawful calling, the Supreme Court of the United States in Allgeyer v. Louisiana, 165 U. S. 578, 17 Sup. Ct. 427, 41 L. Ed. 835, quoted with approval the following:

"The right to follow any of the common occupations of life is an inalienable right. It was formulated as such under the phrase 'pursuit of happiness' in the Declaration of Independence. * * * This right is a large ingredient in the civil liberty of the citizen."

To the same point is an expression of the Court of Civil Appeals in Webb v. Cooks', etc., Union, 205 S. W. 468, as follows:

"It is apparent that the supreme law of the land guarantees protection to all who desire to engage in a lawful calling. And while the ultimate object of the boycott and picketing under consideration may have been to thereby increase the force and power of the union and for the betterment of its members, it is not to be disguised that its immediate object was to intimate and coerce appellant to sign a contract he was unwilling to sign and that he was under no legal obligation to sign."

In the case of Cooks' Union v. Papageorge (Tex. Civ. App.) 230 S. W. 1086, an injunction was issued to restrain a striking labor union and its members from destroying the business of an offending employer, by their language, publications, and acts, and this was held not to infringe upon the constitutional right of free speech. It is contended here that to grant appellant's prayer for injunction in certain respects in which she seeks relief would be violative of the right of free speech guaranteed by the eighth section of the Bill of Rights.

The cases just quoted touch on this question to a certain extent, but probably the one most in point is the Cooks' Case just mentioned, in which the court, responding to such a contention, said:

"One of the defenses that is offered for the unlawful acts of appellants is the plea that to restrain appellants from destroying the business by their language, publications, and acts is to destroy the constitutional right of free speech, but that is a specious plea without reason upon which to base it. The individual right of free speech is not invaded by the restraining order, but it merely says to appellants: 'You must respect the rights of others, which are as sacred as yours, and which must be protected.' The constitution, as in all instances, guarantees freedom, not license and crime. The principle that runs through the entire warp and woof, as a scarlet thread of American law, is that each person must so use his own rights as not to invade the rights of others; and no constitutional law will, when properly administered, give special privileges to any man or class of men."

[5] Of course, no contention can be successfully made that the liberty of speech or of the press can be curtailed without a change in the organic law. Every person has the right to express his opinions and speak his mind on any subject, and no one can declare what he may think or speak.
In the case of Ex parte Tucker, 110 Tex. 335, 220 S. W. 75, the Supreme Court reaffirmed this evident proposition; but, as showing that the liberty of speech is not a license for crime, injustice, and wrong, the court said:

"Equity will protect the exercise of natural and contractual rights from interference by attempts at intimidation or coercion. Verbal or written threats may assume that character. When they do, they amount to conduct, or threatened conduct, and for that reason may * * * be restrained."

In this connection we must not overlook the provisions of section 19 of the Bill of Rights, as follows:

"No citizen of this state shall be deprived of life, liberty, property, privileges or immunities * * * except by the due course of the law of the land."

The rights protected under this section of the Bill of Rights lie at the very foundation of civil government. The freedom of speech guaranteed by section 8, and the right to life, liberty, property, privileges, and immunities, guaranteed by section 19, are not antagonistic or repugnant, nor should they be construed as destructive of each other; they were intended to operate harmoniously, and neither was designed nor should be used as a hiding place for wrong, injustice, or crime. They guarantee valuable privileges, without which life would be unbearable; but, as stated in cases from which we have quoted, neither was intended as a license nor as an instrument to wrong or destroy another.

The acts of appellee towards appellant as revealed by this record, the statements and representations made by him to others concerning her, the espionage over her personal conduct, the listening in on her private conversations, the unwelcome imposition of himself upon her on the public streets, the personal violence and abuse visited upon her at different times, the false charges made to the public officials to secure her arrest or flight from the country, the voluntary confession made to Clark, her fiancé, of his own guilty part in her degradation to prevent their marriage, his instrumentality, by a false charge, in causing her to be driven in disgrace from the sanitarium where she was a trusted and honored employee, all this, in pursuit of a studied, consistent purpose of destruction, constituted conduct—words and speech became verbal acts, and, all together, constituted conduct of which a court of equity will take cognizance, and conduct, too, of such a nature as that the law affords no complete or adequate remedy for the resultant injuries. In such a situation a suppliant should not be turned from a court of equity empty handed.

In accordance with these views, the judgment of the trial court refusing the temporary writ is reversed, and the cause is remanded, with instructions to the court below to issue the temporary writ of injunction, pendente lite, in favor of appellant against appellee as prayed for.

Reversed and remanded, with instructions.