**ALAMO TITLE COMPANY, Appellant,**

v.

**SAN ANTONIO BAR ASSOCIATION et al.,
Appellees.**

No. 4067.

Court of Civil Appeals of Texas.

Waco.

Sept. 27, 1962.

Rehearing Denied Oct. 18, 1962.

Moursumd, Ball & Bergstrom, Morriss, Morriss, Boatwright & Lewis, San Antonio, for appellant.

Davis Grant, Austin, Frank M. Rosson, Philip E. Hamner, San Antonio, for appellees.

WILSON, Justice.

The San Antonio Bar Association and the Unauthorized Practice Committee of the State Bar of Texas obtained a permanent injunction restraining appellant, a title insurance corporation, from preparing certain legal instruments in real estate transactions. Jury findings were to the effect that an attorney, Brown, had prepared such instruments as appellant's agent and employee between 1954 and January 1, 1961; and the business of appellant and Brown's law firm "were operated as a unit" during this period. Although the form of the issues is attacked, it is not contended the findings are not supported by the evidence.

Appellant urges the court erred in not dismissing the case as moot, and in granting the injunction, because there was no evidence or finding of reasonable prob-

ability or threat that the acts enjoined would be done in the future; and because the undisputed evidence establishes the contrary.

While the facts here vary in detail, the basic nature of this case is similar to that of San Antonio Bar Association v. Guardian Abstract & Title Co., 156 Tex. 7, 291 S.W. 2d 697. From 1944 to December 2, 1954, Brown, a stockholder in the corporation, was a salaried employee of appellant, examining titles, advising and preparing legal instruments for customers in connection with appellant's issuance of title insurance policies. The evidence was conflicting as to whether fees charged and collected during this period for preparation of instruments were paid to appellant or Brown.

On December 2, 1954, as a result of complaints by the grievance and the unauthorized practice committees, appellant "made an attempt then to segregate Mr. Brown's legal operations from our own, and made an agreement with him" by which appellant furnished "as in the past" office space, supplies and equipment, and Brown made title examinations. By this written agreement appellant was to pay Brown $200 a month and $2 each for titles examined in excess of 200 per month. Appellant orally "changed the rules a number of times thereafter," as the "Bar Association objected to certain practices." Brown moved his office to adjoining and connected premises, where he set up his "own little force of stenographers" and attorneys who had been employed by appellant. There was evidence Brown never received the $200 payment, and he was paid no money for title examinations. Appellant's bookkeeper testified that during this period no changes were made in the records kept for the title company pertaining to Brown. He was paid sums in excess of $28,000 per year as fees for preparation of instruments which were charged and collected by appellant, out of which Brown paid salaries of attorneys and stenographers who did the work in his office. Appellant's president testified these attorney-employees devoted substantially all their time to title examinations for appellant.

Brown did not employ the stenographers who prepared the legal instruments, he testified, but after appellant employed them they were trained by him, and he importuned appellant's president to raise the salaries of these, and the title examiners in his office. He furnished to appellant's closing agents a fee schedule of charges for preparation of deeds, releases, notes, deeds of trust, extensions and other instruments prepared in his office. The system in use was that the closing agent delivered a title policy file to Brown's stenographers, who prepared required instruments from the title report. Brown "scarcely ever looked the papers over", as this was usually done by a supervising stenographer. He never had "personal contact with the parties" when transactions were closed at appellant's branch offices, he said, and "very seldom" at his office. Appellant's president testified he repeatedly instructed all his "closers" to inform parties to real estate transactions that legal documents had to be prepared by an attorney; to inquire what attorney the parties desired; that if the customer requested appellant to prepare the papers, to state it could not do so; but if requested, to suggest an attorney, to state "if you want, you may employ David C. Brown, who is an attorney who offices next door, and who is associated with the title company." A "closer" testified she never received such instructions.

After further discussions with the Bar Association in 1959 and 1960, appellant entered into a formal written contract with Brown January 2, 1960 under which Brown was to examine titles for $7.30 each, furnishing associate attorneys and employees at his cost. He was to be charged by appellant $940 per month for itemized services, including office and equipment rental, library maintenance, postage, stationery, supplies and bookkeeping service. "Because of necessary proximity of Brown's offices" he and his employees were authorized to participate in appellant's profit-sharing, insurance and retirement plans.

Thereafter, Brown said, if attorneys complained that he was "apparently handling

papers" for their clients, he would reply, "Very well, if we have done it you will get the money." He testified that after January 2, 1960 he couldn't recall "any substantial change in the system of operations"; that seven months later he began a nine-week hospital confinement for injury, after which he was disabled. He testified he received about $30,000 per year from charges for preparing papers, out of which he paid salaries; and that he received a salary of $500 per month. During a six-month period in 1960 there were 1193 title policy applications, some of which were cancelled. In 125 of these no attorney's fee was charged; in 606 the fees for preparing instruments were charged by appellant for Brown's account. There is evidence to show the sums remitted to him by appellant as charges for instruments was insufficient to pay the salaries of the attorneys and stenographers in his office, and that appellant paid Brown the deficiency. Brown testified he and the attorneys in his office spent all their time on appellant's title examinations except when interrupted by stenographers with inquiries concerning preparation of instruments. One of appellant's "closers" testified that to December, 1960 there was no change in the "routine of Mr. Brown's working with the title company and the preparation of the papers." Although there appears to be a conflict in the evidence, Brown testified at one time that his fees for preparation of instruments collected by appellant were not remitted to him, but were disbursed in the form of payroll checks payable to the employees in his office, along with his own check.

This action was instituted June 30, 1960. On December 1, 1960 appellant sent a form letter addressed to all real estate agents advising that the Bar Association was "in the process of suing" local title companies "to restrain them from 'the practice of law' "; that Brown was retiring from active practice; and requesting that parties to realty transactions be asked to designate attorneys to prepare and examine instruments. Appellant also prepared a list of attorneys to be submitted to its customers when such services were needed. Brown retired December 31, 1960, and his connection with appellant was terminated. Appellant's president testified he had previously given Brown six months' notice of termination, and had previously advised appellees' counsel of this intention; that employees had been instructed not to prepare title papers connected with appellant's business under any circumstances; that appellant has no intention of, and never will, go "back to any system of referring its customers to attorneys who are connected in any way with the title company."

 We do not consider the question of likelihood of appellant's resumption or continuation of the acts enjoined as being an ultimate issue of fact for the jury. Extensive search has failed to produce a decision suggesting a contrary conclusion. Although in this State the right of trial by jury is preserved in an equitable action, San Jacinto Oil Co. v. Culberson, 100 Tex. 462, 101 S.W. 197, only ultimate issues of fact are to be so determined; and this historically, for the purpose of informing the conscience of the chancellor. Although in Texas the findings on issues of fact are binding, equitable principles and the relief afforded by equity continue to be applied by the court itself, 1 Pomeroy, Equity, 5th ed., 808; Rule 693, Texas Rules of Civil Procedure; and see Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137, syl. 22. A jury in equity, even under a blended system, does not decide the issue of expediency, necessity or propriety of equitable relief. If submitted, the issue would evoke only a conjectural and speculative surmise which, in our opinion, would not control the processes of equity. It was an element deducible from the circumstances for the court to consider in determining whether wrong or injury might be anticipated and whether chancery powers should be exercised. It constituted here, in effect, a mixed question of law and fact at most. Such questions are not for the jury in injunction cases. City of Austin v. Austin City Cemetery Ass'n, 87 Tex. 330,

28 S.W. 528, 530; Davis v. Upshur County, Tex.Civ.App., 191 S.W.2d 524, no rehearing, relied on by appellant, is inapplicable. There, a temporary injunction was denied and it was stipulated, in effect, that the acts sought to be enjoined would not continue. The holding was that "it was within the legal province of the trial court to deny the relief."

Neither do we accept appellant's position that the case was moot, or that the undisputed evidence established as a matter of law there was no reasonable probability the acts enjoined would recur in the future, if it be assumed such probability was a prerequisite or criterion

In view of appellant's course of operation as shown by the evidence, notwithstanding appellees' efforts to terminate it amicably, injunction was not precluded by the fact that Brown had become incapacitated and had retired from law practice; that under prospect of impending litigation there was a declared resolve to abandon former practices; or that during trial there was announced renunciation of conduct, assurance of non-resumption, intention to refrain, or alteration of plans. Texas State Board of Medical Examiners v. Watt, Tex.Civ.App., 287 S.W.2d 559, 560; Garrett v. Rose, Tex.Civ.App., 161 S.W.2d 893, 894; Hawks v. Yancey, Tex.Civ.App., 265 S.W. 233, 237, no writs; United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303; United States v. Oregon State Medical Society, 343 U.S. 326, 72 S.Ct. 690, 96 L.Ed. 978; 28 Am.Jur. 495; 43 C.J.S. Injunctions § 22, p. 439.

In San Antonio Bar Ass'n v. Guardian Abstract & Title Co., 156 Tex. 7, 291 S.W. 2d 697, 703, where it appeared the associated attorneys were "on the verge of retirement," it was said: "A whole system of operation built up over the years is hardly to be varied in its true consequences by some overnight change of this or that single feature or formality of it." Probability of continuation of appellant's practices is not such a matter as is ordinarily susceptible of direct proof.

It is insisted the trial judge was disqualified because of membership in the State Bar of Texas, a party to the suit. The contention is overruled. Art. 5, Sec. 7, Texas Constitution, Vernon's Ann.St.; Art. 320a-1, Sec. 3, Vernon's Ann.Tex.St.; Hidalgo County Water Improvement Dist. No. 2 v. Blalock, 157 Tex. 206, 301 S.W.2d 593, 597. To sustain it would be to hold no State tribunal could exist in this case. Equity will not suffer a wrong to be without a remedy.

Appellant presents 24 points. We have considered each. In our opinion they do not reflect reversible error.

Affirmed.