**TEXAS PET FOODS, INC., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 5859.**

Court of Civil Appeals of Texas, Waco.

Feb. 8, 1979.

Rehearing Denied March 15, 1979.

Appellant's Second Motion for Rehearing Denied March 29, 1979.

Appellee's Second Motion for Rehearing Denied April 5, 1979.

Vance Dunnam and W. V. Dunnam, Jr., Dunnam, Dunnam & Dunnam, Waco, for appellant.

John L. Hill, Atty. Gen., David M. Kendall, First Asst. Atty. Gen., Troy C. Webb, Chief Asst. Atty. Gen., Douglas G. Caroom, Asst. Chief Asst. Atty. Gen., W. Thomas Buckle, Asst. Atty. Gen., B. J. Skip Newsom, Jr., Asst. Atty. Gen., Environmental Protection Div., Austin, for appellee.

HALL, Justice.

Defendant-appellant Texas Pet Foods, Inc., operates a poultry rendering plant which by a process of cooking converts chicken and turkey offal, including feathers, into a protein supplement for animal feeds. The plant is located in McLennan County near the City of Waco, and is adjacent to the Brazos River.

Appellee State of Texas brought this suit to permanently enjoin defendant from allegedly violating and threatening to violate certain provisions of the Texas Clean Air Act (Article 4477–5, Vernon's Tex.Civ.St.), the Texas Renderers' Licensing Act (Article 4477–6, Vernon's Tex.Civ.St.), the Texas Water Quality Act (V.T.C.A., Water Code § 21.001 et seq.), and permits issued to defendant under those Acts; and for the assessment of monetary penalties provided in those Acts for asserted past violations by defendant.

There are six cookers in the plant. Feathers and lungs are rendered together separately from the other offal. After cooking, the feather-lung mixture is conveyed mechanically through a dryer, then a grinder, then in the form of meal into a storage bin. The other material follows the same route after leaving the cookers, except that its first stop is an expeller where oil is pressed from it and run into a tank, and it does not pass through the dryer.

Under optimum plant conditions odors from the raw materials, the cookers, the expeller, the dryer, the finished meal, and the water used in the processing are controlled and eliminated through a "scrubber system" in the plant and a "ridge-and-furrow system" in fields outside the plant for water disposal. Interworking with these systems and necessary to their proper functions, are fans, steam condensers, water-chlorination equipment for oxidizing particulate, filters, grease traps, recycle pumps, and a "hot well" aeration tank. Maintained and operated at maximum efficiency, the auxiliary equipment prepares vapors and the air in the plant for odor elimination in the scrubber system, creates a "negative air pressure" in the plant which pulls the air and vapors through the scrubber system for elimination of odors, and also cleanses the water of all particulate and heavy odors before it is released to the ridge-and-furrow system for disposal. If the auxiliary equipment fails to work or is permitted to operate inefficiently, the scrubber system and the ridge-and-furrow system cannot properly perform their odor-elimination functions.

The ridge-and-furrow system is a "no-discharge system" consisting of three five-acre tracts upon which the water is released under required measured-flow in "three-day, three-field rotations." A reed grass cover-crop is cultivated on the ridges for transpirative disposal of the water and aerobic elimination of any odors remaining in it. Water is also eliminated from the ridge-and-furrow fields by surface evaporation and by percolation through the underlying soil. The system was not designed for disposal of organic material, and any such solids reaching the furrows will putrefy and cause odors.

Air in the plant is released to the outside through the scrubber system which is "the heart of the air pollution control equipment." The scrubber system consists of two parts. The first is a venturi-type scrubber which is designed to remove heavy odors, oil droplets, fine meal droplets, and other particulate from the air inside the plant. The second scrubber, the primary

one, is a pack scrubber with packing material which will not function properly if contaminated with particulate matter. It is designed to handle only plant air from a low-odor source. It cannot handle the high-intensity odors coming from the cookers, expellers, dryers, and other plant areas; but an efficiently operated venturi scrubber will precondition the plant air and heavy odors for elimination by the pack scrubber.

Trucks delivering offal to the plant enter through an "air curtain" which is a series of fans designed to help maintain the negative pressure in the plant and thereby prevent the escape of odors at the truck entrance. If the plant is not kept sufficiently airtight the air curtain cannot function properly, the negative pressure in the plant is affected adversely, and the scrubber system is rendered less effective.

The case was tried to a jury, beginning on August 2, 1976. Thirteen violations alleged by State against defendant were submitted to the jury for their determination. In their verdict, returned to the court on August 16, 1976, the jury made the following answers to the special issues:

(1) Failed to find that defendant "caused, suffered, allowed, or permitted the emission of odors from its rendering plant property in such concentration and of such duration as to adversely affect or tend to adversely affect human health or welfare or to interfere with the normal use and enjoyment of property on any day from May 1, 1973, to August 2, 1976."

(2), (3) These issues called upon the jury to find the number of days that odorous emissions occurred and to set defendant's penalty for each daily violation within the statutory limits at not less than $50.00 nor more than $1,000.00; but because issue number one was answered "no," the jury did not reach these issues.

(4), (5), (6) Found that on nine separate days between September 5, 1975, and August 2, 1976, defendant "failed to have installed proper hooding and duct work to pull all emissions from either its hotwell, its feather meal holding tanks, its conveying system from the holding tanks to the driers, or its feather meal driers, through the venturi scrubber; and set defendant's penalty at $50.00 for each day of the violation.

(7), (8), (9) Found that on thirteen separate days between September 5, 1975, and August 2, 1976, defendant "failed to control openings to its rendering plant building so as to maintain a negative pressure within the building"; and set defendant's penalty at $50.00 for each day of the violation.

(10), (11), (12) Found that on thirteen separate days between September 5, 1975, and August 2, 1976, defendant "failed to maintain its air pollution abatement equipment in a fully operable and functioning condition"; and set defendant's penalty at $50.00 for each day of the violation.

(13), (14), (15) Found that on forty separate days between May 1, 1973, and August 2, 1976, defendant "discharged solids to its ridge-and-furrow field system"; and set defendant's penalty at $50.00 for each day of the violation.

(16) Failed to find that defendant "allowed water to stand in its ridge-and-furrow field system for more than twenty-four hours on any day" between May 1, 1973, and August 2, 1976.

(17), (18) These were subsidiary time and penalty issues conditioned upon an affirmative answer to issue number (16), and accordingly were not answered.

(19), (20), (21) Found that on twenty-four separate days between May 1, 1973, and August 2, 1976, defendant "failed to maintain a good cover crop on its ridge-and-furrow field system"; and set defendant's penalty at $50.00 for each day of the violation.

(22) Failed to find that defendant "failed to provide an accurate flow-measuring device for water transmitted to the ridge-and-furrow field system" on any day between May 25, 1973, and August 2, 1976.

(23), (24) These time and penalty issues conditioned upon an affirmative answer to issue number (22) were not answered.

(25) Failed to find that defendant discharged any industrial waste into the Brazos River on July 11, 1975.

(26) This penalty issue conditioned upon an affirmative answer to issue number (25) was not answered.

(27), (28), (29) Found that during 1973, 1974, and 1975, defendant failed to submit two annually-required chemical analyses of the water in its water supply well located at its rendering plant to the Texas Water Quality Board, and set defendant's penalty at $50.00 for each of the two violations.

(30), (31) Found that defendant installed a third feather meal dryer on July 30, 1975, without first obtaining a permit from the Texas Air Control Board; and set defendant's penalty at $50.00 for the violation.

(32), (33), (34) Found that on 478 separate days between April 11, 1975, and August 2, 1976, defendant operated its sixth cooker without having applied to the Texas Air Control Board for an operating permit for the cooker; and set defendant's penalty at $50.00 for each day of the violation.

(35) Failed to find that defendant "constructed or operated a wastewater holding pond immediately adjacent to its wastewater disposal fields on any day subsequent to December 31, 1973, without first obtaining a construction permit from the Texas Air Control Board."

In three alternative motions, defendant moved the court to disregard the jury's answer to special issue 33, asserting (1) there was no evidence that defendant operated its sixth cooker on any day between April 11, 1975, and August 2, 1976; (2) the jury's answer of 478 days of operation was excessive by 475 days because the evidence showed only that the sixth cooker had been operated three days during the time in question; and (3) the jury's answer of 478 days was excessive by 138 days because the undisputed evidence showed that defendant's plant was not operated on Saturdays and Sundays during the period in question. The State moved the court for judgment *non obstante veredicto* on special issues 1, 2 and 3, asserting (1) that the evidence conclusively established that on 265 separate days between May 1, 1973, and August 2, 1976, defendant caused or permitted the emission of odors from its plant property of such concentration and duration as to adversely affect human health and welfare and to interfere with normal use and enjoyment of residential property in the area of the plant; and (2) that the minimum civil penalty of $50.00 should therefore be assessed against defendant for each daily violation. The State also moved for judgment *non obstante veredicto* on special issues 22, 23 and 24, asserting (1) that the evidence conclusively established that on every day between May 25, 1973, and August 2, 1976, totaling 1,164 separate days, defendant failed to provide an accurate flow-measuring device of water transmitted to the ridge-and-furrow system; and (2) that the minimum civil penalty of $50.00 should therefore be assessed against defendant for each daily violation.

The motions filed by both parties were overruled. On August 26, 1977, judgment was rendered on the verdict and on "such additional considerations and findings [by the court] as were authorized by law having been had and made." The judgment provided that the State should recover $29,-000.00 civil penalties from defendant (based on the jury's findings); and it also provided that defendant should be permanently enjoined in certain respects involving the future operation of its rendering plant. The decretal portions of the judgment provided as follows:

"It is therefore ORDERED, ADJUDGED AND DECREED that Plaintiff, State of Texas, do have and recover of and from the Defendant, Texas Pet Foods, Inc., the sum of TWENTY–NINE THOUSAND ($29,000) DOLLARS as civil penalties for violations of Texas Air Con-

trol Board Construction Permit C–691 and Operating Permit R–691, Construction Permit C–2831 and Construction Permit C–3608 as well as Sections 3.27, 3.28 and 4.01 of the Texas Clean Air Act, Article 4477–5, Vernon's Annotated Civil Statutes, as well as for violations of Texas Water Quality Waste Control Order No. 00991, and the Texas Water Quality Act, Section 21.251(c), Texas Water Code, for which let execution issue;

"It is further ORDERED, ADJUDGED AND DECREED that Defendant, Texas Pet Foods, Inc., its officers, agents, representatives and employees, are each and all permanently enjoined as follows:

1) Defendant is mandatorily enjoined to keep the immediate premises of the Texas Pet Foods rendering establishment in a clean and neat condition reasonably free from undue collection of refuse, waste materials, insect breeding and standing pools of water, and during all operating hours shall keep all floors in processing areas reasonably free from processing waste, including blood, manure, scraps, grease, water, dirt and litter, and in conjunction therewith specifically enjoined to thoroughly clean said rendering plant floors at the end of each day's operation;

2) Defendant is mandatorily enjoined to control all openings to said rendering plant building and in connection therewith specifically enjoined to maintain a negative pressure within the building at all times so that all plant air is treated through Defendant's air pollution abatement equipment;

3) Defendant is prohibitorily enjoined from operating poultry by-product processing equipment unless all air pollution abatement equipment and associated control mechanisms and instruments are likewise in operation and is mandatorily enjoined to maintain said equipment in a fully operable and functioning condition during all operating hours and in connection therewith Defendant shall:

a) Maintain proper hooding and duct work within the rendering plant building so as to efficiently pull all emissions from the hot well, feather meal holding tanks, the conveying system from the holding tanks to the dryers, and from each feather meal dryer through the Venturi scrubber during all operating hours; and

b) Continuously add sodium hyperchloride or equivalent chemical solution to the pack tower scrubber solution so as to maintain a residual chlorine concentration of not less than one part per million in the scrubber water leaving the rendering plant building;

4) Defendant is prohibitorily enjoined from engaging in any modification or initiating any new construction at Defendant's facility where such modification or new construction may result in the emission of air contaminants without having first applied for and obtained a construction permit, and once obtained, Defendant shall not operate said modification or new construction for more than sixty (60) days without having first applied for an operating permit from the Texas Air Control Board;

5) Defendant is mandatorily enjoined to submit the results of quarterly obtained water well samples analyzing nitrate nitrogen, ammonia nitrogen, total nitrogen, total dissolved solids, chlorides, sulphates, and potassium concentrations to the Texas Water Quality Board at yearly intervals by December 31 of each year wherein said quarterly samples are to be taken;

6) Defendant is mandatorily enjoined to remove the layer of organic solid materials covering the top soil within the Texas Pet Foods ridge and furrow system and is prohibitorily enjoined from discharging grease, floating materials and solids to said ridge and furrow field system;

7) Defendant is prohibitorily enjoined from transmitting wastewater from Defendant's processing facility to any one of three fields within Defendant's ridge and furrow field system unless the receiving field receives wastewater only one day out of every three, or, when such field is

taken out of rotation with the approval of the Waco Regional Office of the Texas Air Control Board, one day out of every two;

8) Defendant is mandatorily enjoined to maintain a good cover crop within the ridge and furrow field system for the effective transpiration of wastewater generated to said system;

9) Defendant is mandatorily enjoined to maintain accurate daily flow records for the amount of water daily transmitted to each field included within the Texas Pet Foods ridge and furrow field system;

10) Defendant is mandatorily enjoined to maintain all trailers and vehicles used in the conveyance of raw poultry byproduct materials to the Texas Pet Foods facility in a leak-proof condition at all times that said trailers and vehicles are operated on public roads and highways; and

11) Defendant is prohibitorily enjoined from causing or contributing or threatening to cause or contribute to the emission of odors or other air contaminants into the atmosphere in and around the Texas Pet Foods rendering facility in such concentration and of such duration as are or may tend to be injurious to or adversely affect human health or welfare, or as to interfere with the normal use and enjoyment of animal life, vegetation or property."

Express findings of fact were not made by the court.

The State's right to injunctive relief against defendant is based solely upon the provisions of § 4.02(a) of the Texas Clean Air Act, § 19(b) of the Texas Renderers' Licensing Act, and § 21.253(b) of the Texas Water Quality Act, supra. Each of those statutes requires a finding of a present violation or a threatened violation of the Act to which it relates before injunction may issue.

■ No issues were submitted to the jury inquiring about present or threatened violations, and the State did not request any. The issues submitted inquired only about past violations during specific periods of time which ended with the beginning of the trial on August 2, 1976. Since there was no finding by the jury that defendant was actually committing or was threatening to commit the acts which were enjoined by the court, there was no legal basis for the injunction, unless the evidence conclusively established present or threatened violations. We shall later show that those facts were not conclusively established.

■ The State refers to the recitation in the judgment that it was based not only upon the verdict but also upon "such additional findings by the court as were authorized by law," and asserts that the injunction is supported by the court's implied findings. We reject that contention. Where the right to a permanent injunction depends on the existence of a fact, the parties are entitled to a jury trial. 31 Tex. Jur.2d 301, Injunctions, § 187. It is provided in Rule 279, Vernon's Tex.Rules Civ. Proc., that upon appeal of a case submitted to a jury on special issues, "all independent grounds of recovery or of defense not conclusively established under the evidence and upon which no issue is given or requested shall be deemed as waived." Accordingly, the State waived its right to the injunction in question. Rule 279 also provides in part that if one or more of a cluster of issues necessary to sustain an independent ground of recovery are submitted to and answered by the jury, and if one or more of such issues are omitted without objection of the defendant, and if there is evidence to support a finding thereon, and if no express findings are made by the court on the omitted issue or issues, then "such omitted issue or issues shall be deemed as found by the court in such manner as to support the judgment." The State contends that because defendant did not object to the failure of the court to submit special issues inquiring about present violations and threatened violations, those issues must "be deemed as found by the court" in support of the injunction under the provisions of Rule 279. We disagree. Issues dealing with present or threatened violations, which

would have supported the remedy of injunctive relief, were not necessary to sustain the remedy of the assessment of monetary penalties for past violations. Neither would the State have needed findings of past violations in order to secure an injunction based upon findings of actual or threatened violations. The remedies are independent of each other. Defendant was not required under Rule 279 to object to the court's failure to submit *any* special issues relating to the State's remedy of injunction. Rather, as we have said, by failing to request those issues the State waived the remedy.

■ Acts and practices occurring prior to the suit will not, alone, support injunctive relief. 31 Tex.Jur.2d 69, Injunctions, § 22. However, evidence showing that an activity complained against has been a settled course of conduct by the defendant continuing to or near the time of trial raises the presumption and will support a finding, absent proof to the contrary, that the activity will continue. *Texas Pet Foods, Inc. v. State,* 529 S.W.2d 820, 827 (Tex.Civ.App.— Waco 1975, writ ref'd n. r. e.). The State asserts that rule supports the injunction, here, but we cannot agree. First, the only finding which can be said to show a past violation "continuing to or near the time of trial" is the finding in answer to special issue 33 that for 478 days to the date of trial defendant operated its sixth cooker without a permit. Second, there is an abundance of proof which would have supported findings that defendant did not intend to continue that violation or the other past violations found by the jury. Accordingly, it was the State's burden to seek and secure favorable findings on those questions. Rule 279, supra. There is evidence that in 1973 defendant spent $200,000.00 for air pollution control equipment and renovation of the plant building; that in the twelve months immediately preceding the trial it spent an additional $100,000.00 toward improvement of the plant pollution control equipment and over-all operation of the plant; that after the roof was damaged by a storm in April, 1975, a new steel and concrete roof was installed at the cost of $25,000.00; that in August, 1975, defendant

spent over $30,000.00 overhauling its electrical equipment, and employed the electrical contractor to thereafter inspect the equipment each Monday and authorized him "to do whatever is necessary to keep the motors and electrical equipment in top condition"; that during the three years preceding the trial defendant installed three new boilers at a cost of $82,000.00; and that defendant properly maintains the ridge-and-furrow system, and replants the grass when it dies, and that the fields are operating effectively. There was testimony by two engineers employed by the State Air Control Board that during July, 1976, defendant made "favorable changes" in the hooding and duct work and "began taking adequate steps" through the use of chemicals to clean the pack-scrubber system; that the hooding is "now effective"; that the air pollution abatement in defendant's plant is "a very good one" and "appears to be operating in a normal fashion, except for the mist eliminator"; that defendant recently added two sieves on the water flow to the fields; and that defendant now does "a pretty good job of washing the floors." Additionally, on January 1, 1976, the State licensed defendant to operate its rendering plant for the year 1976, expressly stating in the license that defendant had "complied with the provisions" of the Texas Renderers' Licensing Act. That Act is titled, "An Act to promote the health, safety, and welfare of the people by regulating the business of transporting, processing, or disposing of rendering raw material, and the bodies of dead animals, poultry, or any parts thereof, by burying, burning, cooking, or processing." Acts 1969, 61st Leg., p. 184, ch. 78, eff. Sept. 1, 1969. Defendant's witnesses, including a mechanical engineer and an expert in environmental studies, testified that the odor abatement system in defendant's plant, "the machinery and everything," is properly maintained and operated and is operating properly and efficiently; that proper negative air pressure is maintained in the plant; that the ridge-and-furrow system is in "good shape"; that "the plant is working beautifully, today";

and that the odors inside the plant and in the ridge-and-furrow fields are minimal and are detectable only a short distance off defendant's premises, if at all. Defendant's president testified that he has continuously attempted to improve the operation of the plant and the efficiency of the equipment; that he has installed two venturis and three boilers, although only one of each is required by the State; that he had done everything requested of him by the Air Control Board, the Water Control Board, "or anybody else"; and that he is now "ready and willing to spend whatever money is necessary to do whatever is requested that should be done in the operation of this plant that is feasible to do . . . I always did in the past and I will act the same in the future." His testimony shows that defendant had not applied for a permit to operate the sixth cooker, but he testified that the cooker had been used with the express knowledge and permission of the State's enforcement officials. It is reasonably inferable from the record that the State was not particularly concerned with the operation of the sixth cooker until it began preparations for this lawsuit. Finally, after assessing a penalty of $23,900.00 against defendant for operating the sixth cooker without applying for a permit, we believe the jury could reasonably have determined that defendant would immediately apply for the permit to avoid such penalty in the future.

The evidence shows that the sixth cooker has been in use in defendant's plant since September 5, 1974. There is direct testimony that it was in operation on that day and on June 11, 1976. The testimony of defendant's plant manager and its president establishes that the cooking of offal begins at 4:00 P.M. on Monday through Friday each week and ends between 9:00 A.M. and 11:00 A.M. the next day, and that the balance of the day is devoted to cleaning operations. Defendant's president stated that the plant processes approximately 70 tons of offal per day, and operates five and one-half or possibly six days per week, depending upon the tonnage coming in. He testified as follows: "Q. All right. Now, you have six cookers

and the material is taken directly from the unloading area to the six cookers, is that correct? A. Right. Q. All right. I believe you testified that you can cook between ten and twelve thousand pounds in one cooker. Is that an accurate statement? A. That is correct. Q. So if you have got six cookers then that means you cook as much as 72,000 pounds at one time. Is that right sir? A. It's true, if all the cookers were empty, let's say, on Monday evening. Let's say at 4:00 o'clock, if all the cookers are empty, that would be a true statement, we can load in there about 60,000 pounds . . ." He said approximately two and one-half hours are required to cook a load of intestinal matter, "or a little more time depending on how much you load in a cooker," and that a load of feathers cooks in about one hour.

■ The evidence we have recited is legally sufficient to support the jury's finding that defendant regularly operated the sixth cooker during the period inquired about, including its operation on Saturdays; and, in the light of the entire record, we hold the finding is not against the great weight and preponderance of the evidence. Defendant's contrary contentions are therefore overruled. However, we agree with defendant that there is no probative evidence that defendant operated the cooker on Sundays. We judicially know there were 69 Sundays between April 11, 1975, and August 2, 1976. Accordingly, the penalty assessed against defendant for operation of the cooker is excessive in the amount $3,450.00.

The State concedes there is no evidence that defendant used its cookers on Sundays, but it argues that the fact that the sixth cooker was in operable condition on Sundays supports the jury's finding, citing *State v. Harrington,* 407 S.W.2d 467 (Tex. Sup.1966). We reject that argument. The *Harrington* case dealt with the illegal drilling and operation of a deviated oil well by the defendants across their own lease lines. The court held that proof that the defendants maintained the well in an unplugged state ready to produce its allowable established that the well "was being operated

and maintained so as to attain the result appropriate to the nature of the enterprise," the word "operated" meaning, there, "everything that is done to maintain an oil well so as not to abandon it." The *Harrington* case is distinguishable on its facts from our case; and we do not believe its holding under those facts supports the State's contention here.

The State has brought forward two counterpoints in which it assigns error to the court's rulings on its motion for judgment *non obstante veredicto* on special issues 1, 2 and 3, which inquired about the emission of odors of certain concentration from defendant's plant, and on special issues 22, 23 and 24, which asked whether defendant provided an accurate flow-measuring device for water transmitted to the ridge-and-furrow fields.

The State correctly acknowledges in its brief that "the majority of the evidence introduced in the trial court dealt with whether the Appellant had emitted odors from its rendering plant which either adversely affected the health or welfare of individuals living in the area, or interfered with the use and enjoyment of these individuals' property." In fact, direct proof on that question filled several hundred pages in the statement of facts, and we shall not detail it. Suffice it to say there was an abundance of testimony from lay and expert witnesses favorable to both the State and defendant.

Similarly, the record reveals conflicting testimony as to whether or not defendant provided a device for measuring the flow of water to its fields during the period in question, and whether two such devices which testimony shows the defendant did maintain at separate times throughout the period were accurate.

Under the record, the court properly overruled the State's motions for judgment *non obstante veredicto.*

Other arguments and contentions are made by the parties. Some are rendered immaterial by our holdings, above. The remainder are without merit and are overruled.

The order granting the injunction is set aside; and judgment is rendered denying the State any injunctive relief against defendant. The judgment allowing the State a recovery of civil penalties from defendant in the sum $29,000.00 is modified to allow a recovery of $25,550.00. As so modified, the judgment is affirmed.

The costs of this appeal are taxed 60% against the State and 40% against defendant.

## ON REHEARING

Both parties have filed motions for rehearing.

The State asserts our reasons for setting aside the injunction conflict with the holding of this court in *Alamo Title Company v. San Antonio Bar Association,* 360 S.W.2d 814 (Tex.Civ.App.—Waco 1962, writ ref'd n. r. e.). We disagree. In *Alamo Title Company* the proof showed that certain acts of unauthorized practice of law alleged against the defendant Title Company, if committed at all, were a settled course of conduct by the Title Company from 1954 to within four months of the trial held in April, 1961. The jury found the acts were in fact committed, and that the business affairs of the Title Company and the lawyer involved were "operated as a unit" during that full term of years. Accordingly, this court held that the ultimate facts established by the findings and the proof were sufficient to invoke the chancery powers of the trial court, and that under the facts of that case "the issue of expediency, necessity or propriety of equitable relief," by way of injunction to prevent future violations by the Title Company, was an issue for the court and not the jury. On the other hand, unlike the record in *Alamo Title Company,* the record before us does not raise by findings nor by the evidence the presumption of future violations by defendant, necessary to invoke the equitable jurisdiction of the court for the issuance of the injunction in question. Moreover, in the present case, as shown by the jury's answer to special issue number one, the State failed

to secure a finding that past violations by defendant were damaging to the public health and welfare; whereas the unauthorized practice of law committed by *Alamo Title Company* per se endangered the public welfare. Finally, the Bar Association's suit against *Alamo Title Company* was not based upon a statute requiring findings of present or threatened violations for injunctive relief. The holdings are not in conflict.

In our original opinion, when pointing to evidence which destroyed the presumption of continued violations by defendant, we made the statement that "there is an abundance of proof which would have supported findings that defendant did not intend to continue" past violations. We did not mean by that language, as the State suggests we did, "to make 'intent' to commit a proscribed act an element which must be proven in order to secure an injunction."

Neither motion for rehearing contains meritorious complaints. Both are overruled.